PEOPLE v WIGFALL

Docket No. 80977. Submitted February 11, 1987, at Grand Rapids. Decided June 16, 1987.

Johnnie L. Wigfall was convicted by a jury in Berrien Circuit Court of aiding and abetting in the commission of an armed robbery and possession of a firearm during the commission of a felony. During trial, the prosecution was permitted to bring out that defendant in a voluntary statement to the police made prior to his arrest but after his having been advised of his constitutional rights failed to mention certain salient facts. During defense counsel's examination of defendant, the trial court, William S. White, J., in response to prosecution objections to the use of leading questions, at various times in the presence of the jury suggested that he swear defense counsel as a witness since counsel was the one giving testimony and questioned the quality of defense counsel's legal education. Defense counsel moved for a mistrial on the basis that the court's berating of counsel might adversely affect the jury's consideration of the facts. The court denied the motion. Defendant appealed.

The Court of Appeals *held:*

1. The demeaning criticism of defense counsel by the trial court in the presence of the jury was improper. While not all improper criticism of counsel by a trial court will mandate reversal, reversal is mandated here because the remarks, coming as they did during the examination of defendant, created a strong likelihood that the jury would thereby be prejudiced against defendant and defense counsel. The court's demeaning criticism of defense counsel denied defendant a fair trial before an impartial jury.

2. It was not error for the prosecution to bring out the fact

REFERENCES

Am Jur 2d, Evidence §§ 611, 613.
Am Jur 2d, Trial §§ 116-119.
Am Jur 2d, Witnesses § 596.
Remarks or acts of trial judge criticizing, rebuking, or punishing defense counsel in criminal case, as requiring new trial or reversal. 62 ALR2d 166.

that defendant during a prearrest interview with the police failed to mention certain salient facts, since, although defendant had been advised of his constitutional right to remain silent, his silence as to those facts was not as a result of his having exercised his constitutional right.

Reversed and remanded.

1. CRIMINAL LAW — JUDICIAL MISCONDUCT — CRITICISM OF COUNSEL — APPEAL.

Demeaning criticism by a trial court of counsel for a criminal defendant in the presence of the jury is always improper; reversal of a criminal conviction is mandated only where the court's participation or conduct denied the defendant a fair and impartial trial by unduly influencing the jury.

2. CRIMINAL LAW — DEFENDANT'S SILENCE — EVIDENCE — CONSTITUTIONAL LAW.

The prosecution may properly bring out during trial and comment upon during closing arguments the fact that the defendant in a voluntary statement to the police made prior to arrest but after having been advised of his constitutional rights failed to mention certain salient facts, since under those circumstances the defendant's silence is not the result of the exercising of his constitutional right to remain silent.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Paul Maloney,* Prosecuting Attorney, and *Brian S. Berger,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Ronald J. Bretz*), for defendant.

Before: R. M. MAHER, P.J., and SAWYER and R. L. TAHVONEN,* JJ.

R. L. TAHVONEN, J. Defendant, Johnnie Lee Wigfall, was convicted by a jury as an aider and abettor of armed robbery, MCL 750.529; MSA 28.797, MCL 767.39; MSA 28.979, and of possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). Defendant was sen-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

tenced to eight to twenty years in prison for the armed robbery and to a mandatory consecutive two-year term for the felony-firearm conviction. He now appeals as of right and we reverse.

Defendant contends he was denied a fair trial when the trial judge repeatedly criticized and belittled defense counsel in the presence of the jury. Defendant points to the following exchanges which occurred during the course of his trial:

> *Q. [Mr. Ryan, attorney for defendant]* You gave the gun back to Fields?
>
> *A. [Defendant]* Yes.
>
> *Q.* After you talked to Trooper Gunderson, you were arrested, weren't you?
>
> *A.* Who?
>
> *Q.* Well, after you talked to Gunderson, he let you go, didn't he?
>
> *A.* Yeah.
>
> *Q.* And you went out to try to help him?
>
> *A.* Yeah.
>
> *Q.* And did you try to help him?
>
> *A.* Yeah.
>
> *Q.* You tried to.
>
> *Mr. Banyon:* Your Honor, Mr. Ryan is continually leading this witness.
>
> *The Court: He has been since he started. I think I would let your client testify instead of you, unless you want to take the oath and get on the stand and be sworn.*
>
> *Mr. Ryan:* No, sir. I do not.
>
> *The Court: Then, I suggest you let the witness testify, not you. You haven't done very well yet, so far. Don't ask leading questions is what I am saying.*
>
> *Mr. Ryan:* Okay.
>
> \*   \*   \*
>
> *Q. [Mr. Ryan]* Can you tell the jurors how you know they were checking it out to rob it?
>
> *A. [Defendant]* The time that I had went and

talked to the police and he had told me what had happened, then, when Trooper Olson, he was asking me, did I know then, then, I was referring to what the police had told me earlier, and when I told about sitting on the side of the road, that's what I assumed they were doing was checking out the place.

*Q.* Do you know, for a fact, right now, whether or not they were checking the station to rob it, when you were in the car?

*A.* I don't know.

*Q.* When you saw Rogers and Nunn, when they gave you the gun back to give to Fields, did they give you any money?

*A.* Before Robert Rogers pulled up, I had asked Jimmie about my $2.00 that I had gave him earlier, and he said that he had to go in the house and get it from his mother. And he went and got $2.00 and brung it back out.

*Q.* Was that $2.00 for using the gun?

*A.* No. It was $2.00 that I had gave him earlier to buy some gas.

*Q.* And he went inside his house to get that?

*A.* Inside his mother's house.

*Q.* Did he tell you, here, this is money we got from the robbery?

*Mr. Banyon:* Your Honor, again, I'm going to object, he is still leading the witness.

*The Court: He certainly is. I am going to put him under oath pretty soon and have him sworn in so he can testify. He might as well be under oath as long as he is doing it.*

\* \* \*

*Q.* That's not your car?

*A.* No.

*Q.* Was that gun ever yours?

*A.* No.

*Q.* Had you ridden around in that car before?

*A.* Just that time.

*Q.* When they dropped you off, after going to Henry's and getting the hamburgers, did you ever ride in that car again?

*A.* No.

*Q.* When you gave them that gun, did you want them to use it in a robbery?

*A.* No.

*Q.* Did you intend for them to go out and shoot Carol Palmer in the head?

*A.* No.

*Q.* Did you have any idea they were going to do that?

*A.* No.

*Q.* Did you even think about it?

*A.* No.

*Q.* When you gave the gun back to Tony Fields, did you think about the gun?

*Mr. Banyon:* Your Honor, Mr. Ryan is leading his witness.

*The Court: I would say that is an understatement, Mr. Banyon. Your statement is an understatement. He is leading. He is testifying.*

*Mr. Ryan:* I am not testifying, Your Honor. I do not—

*The Court: Everything you said suggests the answer. Did you go to law school and understand what a leading question is? It suggests the answer. Everything you said suggests the answer. That is a leading question. You know that is not proper. I presume you learned that. You are suggesting the answer.*

*Mr. Ryan:* I am not intending to, Your Honor.

*The Court: Then don't do it, then. Follow the Rules of Evidence. Ask the question—*

By *Mr. Ryan:*

*Q.* What did you think when you gave him the gun?

*The Court: That is a proper question, that does not suggest the answer.*

*The Witness:* That it was his, that Tony—he had let Tony use it and he was getting it back from Tony.

*Mr. Ryan:* I have no further questions of this witness.

*The Court: Very well. That was a very fine question, it did not suggest the answer.*

*Mr. Banyon:* I have nothing further, Your Honor. [Emphasis added.]

During a recess, defense counsel made a motion for a mistrial because the trial court had "said some things about law school, and what not" and because counsel was not "sure that the effect of that can be taken away from the jury." The trial court denied the motion, stating:

*The Court:* The objection made was leading questions. As you know, a leading question is one that suggests the answer, and they were highly leading. As you rather curtly, Mr. Ryan, in effect, criticized the Court for ruling that they were leading, when you said they weren't. I merely said I think, Mr. Ryan, you probably learned in law school that a leading question is one that suggests the answer. And those are highly suggestive.

I recall when Judge Taylor was a prosecutor, he would ask a question, isn't it a fact, witness, that such and such happened. Opposing would object, leading. Judge Taylor would say that is not leading, because it doesn't suggest the answer, because it can be answered yes or no.

Obviously, the jury would be instructed that if they have come to believe, by my remarks I have made, or any conduct I have made during the trial, that I am trying to tell them how to decide the case, they must completely disregard that, because the case will be decided strictly from the evidence produced by testimony and exhibits received and that they are the sole and exclusive judges of the facts, credibility of witnesses and no way are they to take what the Court says, conduct or remarks as I am trying to decide the case. They will be so instructed. So, the motion for mistrial is denied. Bring the jury back in.

During his instruction to the jury, the trial

court provided the jury with the standard instructions to the effect that the trial court's ruling statements and remarks were not evidence and were not intended to indicate any opinion by the court as to how the case should be decided.

Our Supreme Court has had occasion to address a similar issue in *People v Neal,* 290 Mich 123, 129; 287 NW 403 (1939). The Court stated:

> Pert remarks and quips from the bench have no place in the trial of a criminal case, do not comport with judicial dignity and the injurious effect of such, though thoughtlessly uttered, may prove exceedingly damaging to the party entitled to a fair trial.
>
> The accused had a right to be represented by an attorney and have the attorney treated with the consideration due such an officer of the court and belittling observations aimed at the attorney are, necessarily, injurious to the one he represents.

The *Neal* Court determined that the trial judge's gratuitous statements denied defendant a fair trial. On that basis, the Supreme Court reversed.

That same year, our Supreme Court again faced a situation where the trial court had made unfavorable comments about counsel in the presence of the jury. In *In re Parkside Housing Project,* 290 Mich 582, 596; 287 NW 571 (1939), the Supreme Court held:

> It is error for the court to comment, unfavorably, in the presence of the jury, on the conduct of the trial by counsel for one of the parties, especially in view of the fact that counsel, in such a situation, is without opportunity to resent such criticism without risk to himself and injury to his clients' cause with the jury. *Christman v Railway Co,* 210 App Div 104; 205 NY Supp 594 [1924]; 64 CJ 92. It is improper and prejudicial for the judge

to rebuke counsel and accuse him in the presence of the jury of unprofessional conduct, for asking a witness a question which is proper and which counsel has the right to ask. *Cooke v Glassheim,* 207 App Div 592; 202 NY Supp 599 [1924].

The *Parkside Housing Project* Court further stated that, even where counsel makes contentions that are not deemed sound, the trial judge should overrule them with dignity and not use language holding counsel up to ridicule. 290 Mich 597. Similarly, in this case the issue is not whether counsel was asking leading questions. Rather the issue is whether the manner in which the trial court correctly sustained the objections denied the defendant a fair trial. The *Parkside* Court noted that belittling defense counsel results in belittling the defendant and his claims or defenses. 290 Mich 598. The Court held that there was "strong likelihood" that the jury was prejudiced against the defendant and his counsel because of the conduct of the trial judge. 290 Mich 599. Jurors are prone to follow the slightest indication of bias or prejudice on the part of the trial judge. 290 Mich 600. The words and actions of a trial judge weigh heavily with a jury. Even inadvertent or thoughtless remarks by the trial judge may prove exceedingly prejudicial in a criminal trial. *People v Blachura,* 81 Mich App 399, 413-414; 265 NW2d 348 (1978), lv den 403 Mich 816 (1978). Because of the conduct of the trial judge, the *Parkside Housing Project* Court determined that the defendant was denied a fair trial and reversed and remanded for a new trial.

In *People v Cole,* 349 Mich 175; 84 NW2d 711 (1957), defense counsel, in the presence of the jury, asked the trial judge for "clarification." The court answered: " 'No, the court is not teaching law at

the present time. The court has ruled. Go ahead.' " *Cole, supra,* 199. The Supreme Court held:

> A fair and impartial trial by jury demands, however, the display of impartiality on the part of the trial judge. This Court has never hesitated to order a new trial in the interest of justice when it thought the wide discretion of the trial judge had been abused so as to prejudice the rights of the litigant. *People v Neal,* 290 Mich 123; *In re Parkside Housing Project,* 290 Mich 582; *McDuff v Detroit Evening Journal Co,* 84 Mich 1 [47 NW 67] 22 Am St Rep 673 [1890]. [*Cole, supra,* 200.]

The *Cole* Court quoted from the opinion of Judge Learned Hand in *Brown v Walter,* 62 F2d 798, 800 (CA 2, 1933), to remind trial courts that justice greatly depends on the atmosphere of the courtroom, and that atmosphere depends primarily on the judge. *Cole, supra,* 200. Because of the trial court's belittling remark quoted above, and several other colloquies which occurred between the trial judge and defense counsel, and because it was a "close case" (which would bear on the question of whether or not the errors were prejudicial), the *Cole* Court concluded that an "atmosphere of prejudice which deprived defendant of a fair trial" was created. The Court reversed and remanded. *Id.*

Trial judges who berate, scold and demean a lawyer so as to hold him up to contempt in the eyes of the jury destroy that balance of judicial impartiality necessary to a fair hearing. *People v Wilson,* 21 Mich App 36, 38; 174 NW2d 914 (1969). A jury trial demands the fact and appearance of judicial impartiality, neither of which should ever be compromised by comments that unfairly belittle defense counsel. *People v Atkinson,* 35 Mich App 338, 340; 192 NW2d 687 (1971), lv den 386 Mich 772 (1971).

While a trial court's unfair criticism of counsel in the presence of the jury is always improper, reversal is not appropriate unless the court's participation or conduct denied the defendant a fair and impartial trial by unduly influencing the jury. *People v Turner,* 99 Mich App 733, 745; 298 NW2d 848 (1980), rev'd on other grounds 411 Mich 897 (1981).

The prosecutor in the case at bar contends that, when the trial court's remarks to defense counsel are viewed in light of the entire trial, the comments did not unduly prejudice defendant or deny him a fair trial. Counsel cites *People v Moss,* 70 Mich App 18, 40; 245 NW2d 389 (1976), lv den 399 Mich 852 (1977), wherein a panel of this Court stated:

> The few arguably intemperate comments of the court, when viewed in the context of a lengthy trial, and a forceful curative instruction, did not deprive the defendants of a fair trial. *People v McIntosh,* [62 Mich App 422; 234 NW2d 157 (1975)] *supra, People v Gray,* 57 Mich App 289; 225 NW2d 733 (1975).

There was no attempt by the trial judge in *Moss* to belittle the defense attorney. Rather, the issue was whether the trial comments were "unduly abrasive." *Moss, supra,* 38. The panel stated that, while some of the trial judge's rulings could have been "tempered" and were "sharper than necessary," the fact that the judge could have shown more restraint is not the test for reversal. The dispositive question is whether the court's participation denied the defendant a fair and impartial trial by unduly influencing the jury. *Id.* Further, in *Moss,* the trial judge gave a far more "forceful instruction" than in the case at bar. Here, only

CJI 3:1:09, which is the standard instruction, was given.

Defense counsel in the case at bar was not treated with the consideration due an officer of the court. See Code of Judicial Conduct, Canon 3, §§ (A)(3), (A)(8). The trial court's remarks were improper, resulting in ridicule and denigration of defense counsel in the presence of the jury. The comment about "law school" was especially injurious to the dignity of defense counsel who was "without opportunity to resent such criticism without risk to himself and injury to his client's cause with the jury." This created a "strong likelihood" that the jury could become prejudiced against defendant and defense counsel. *Parkside Housing Project, supra.* Defendant was defense counsel's main witness and the disparaging remarks by Judge White occurred during defense counsel's direct examination of defendant. This circumstance further connected the belittling of counsel to defendant, and additionally prejudiced the jury against defendant. Applying the test of *Turner, supra,* i.e., whether the court's remarks denied defendant a fair and impartial trial by unduly influencing the jury, and recognizing that juries are particularly susceptible to the words and actions of the trial judge, we are persuaded that the defendant was denied the fair and impartial trial to which he is entitled under the law.

We reverse his conviction for this reason.

Because this case must be retried, we deem it prudent to consider defendant's further claim that his Fifth Amendment right to remain silent was violated when the prosecutor questioned him about his failure to tell police certain facts about the charged crime and that the error was compounded when the prosecutor commented upon defendant's omissions during closing argument and rebuttal.

The prosecutor responds that the defendant's statements and omissions were both properly admitted at trial and therefore appropriate topics for argument.

Testimony at trial revealed that on February 18, 1982, three days subsequent to the charged crime, defendant voluntarily went to the St. Joseph State Police Post at 10:55 A.M. Defendant talked with James W. Gunderson, Detective Sergeant of the Michigan State Police. Prior to the interview, defendant was advised of his constitutional rights, signed a waiver and agreed to talk to Gunderson without the presence of an attorney. Defendant was not under arrest at this time. Gunderson testified as to the statements defendant made during this interview. The prosecutor then questioned Gunderson about facts which defendant *did not* state during this interview:

*Q.* [*Mr. Banyon*] Did Johnnie Wigfall tell you that he had given Jimmie Nunn or Robert Rogers a gun which was used in this armed robbery?

*A.* No, he did not. He denied ever owning a gun or giving a gun to anybody.

*Q.* Now, you made it clear to Mr. Wigfall what you were questioning him about, did you not?

*A.* Yes, sir.

*Q.* Did he mention anything to you, Detective Gunderson, about getting a gun back from Robert Rogers the night of the 15th?

*A.* No, he did not.

*Q.* Did he mention anything to you about getting any money from Jimmie Nunn the night of the 15th?

*A.* No, sir.

*Q.* Did he mention anything to you about Jimmie Nunn or Robert Rogers telling him, on the night of the 15th, that they had just pulled an armed robbery and shot a woman?

*A.* No, there was no conversation like that, whatsoever.

During cross-examination of defendant, the following colloquy took place:

*Q. [Mr. Banyon]* Okay. You talked to Trooper Gunderson, or Detective-Sergeant Gunderson on the 18th, right?

*A. [Defendant]* Yes.

*Q.* He told you about this armed robbery, right?

*A.* Yes.

*Q.* He told you about Mrs. Palmer getting shot and robbed, right?

*A.* Yes.

*Q.* You knew a gun was involved, he talked to you about the gun, if you could help locate the gun?

*A.* He asked me would I locate the money tray and Robert Rogers.

*Q.* Robert Rogers and the gun?

*A.* Yes.

*Q.* Now, when he told you that, you knew that Rogers and Pooky had pulled this robbery, right.

*A.* Yes.

*Q.* Now, when you talked to Detective Gunderson on the 18th, you didn't tell him that you had talked to Jimmie Nunn and Robert Rogers on the night of the robbery, and that they told you they did it, did you? You didn't mention anything about that to him?

*A.* No.

*Q.* You didn't tell Detective Gunderson that you had, in fact, given them the gun that was used in the robbery, did you?

*A.* No.

*Q.* You didn't tell Detective Gunderson that you, in fact, had taken the gun back that was used in the robbery, did you?

*A.* No.

*Q.* You didn't tell him that you got money from Jimmie Nunn that night, did you?

*A.* No.

*Q.* But you were going to cooperate with the police, is that right?

*A.* Yes.

*Q.* You didn't get that gun back for Detective Gunderson?

*A.* No.

*Q.* You didn't locate that case tray?

*A.* No.

*Q.* You didn't locate Robert Rogers?

*A.* No.

*Q.* In fact, you didn't do anything until the 20th, when you were arrested, is that right?

During closing argument the prosecutor stated:

I think also it sheds a little light upon the Defendant's honesty and his believability, in this case, is the interview he had with Detective-Sergeant Jim Gunderson of the State Police. This was only three days after the armed robbery and the shooting. Detective Gunderson—he came in to see Detective Gunderson at the State Police Post because he heard the State Police were looking for him. Now, he had an interview, and you heard Detective Gunderson testify about that, and he wasn't arrested that day. He was questioned about the event. He denied ever furnishing a gun which was used in the armed robbery. No, I didn't furnish the gun. And he supposedly, being a good citizen, helping the police solve this, was going to look for the cash tray and going to look for Robert Rogers. He knew what Detective Gunderson was questioning him about. He didn't tell him anything about the gun, didn't tell him he had given the gun to Nunn or Rogers or that he had gotten the gun back from Rogers. He didn't even tell Detective Gunderson what Jimmie Nunn and Robert Rogers had told him.

Now, if he claims innocence in this matter, and says he was just an innocent third party, why

didn't he, at that point, tell the State Trooper, well, this is what I know. He didn't do that. And I think this shows, on his part, he tells a partial truth, a partial truth.

During rebuttal argument the prosecutor stated:

He says, well, he went in there and he was going —my client, the only thing he ever did was look for this tray. How hard did he look? He is sup- ,posed to be cooperating. He lied to Gunderson. He said, I didn't supply that gun. I didn't give those guys any gun. I don't know what you are talking about. He didn't mention Tony Fields to Gunder- son. He didn't say anything about the gun. He didn't say he had given them the gun. He didn't say I got the gun back. He didn't say I talked to Nunn and Rogers that night and they told me I committed an armed robbery. How helpful was he being then?

It is clear that the prosecution used defendant's failure to include salient information in his state- ment to the police to challenge the truth of the statements defendant did make to the police and to impeach his testimony at trial. In short, defen- dant's silence was used in an effort to prove he was a liar, not as substantive evidence to establish that he committed the crime charged.

In *People v Karam,* 106 Mich App 383; 308 NW2d 220 (1981), lv den 414 Mich 870 (1982), this Court held that where a defendant makes a volun- tary statement, questioning regarding omissions from that statement are proper impeachment and do not run afoul of the rule adopted by the Michi- gan Supreme Court in *People v Bobo,* 390 Mich 355; 212 NW2d 190 (1973). We agree with the majority's analysis in *Karam* and view it as dispos- itive here.

We recognize that in this case, unlike in *Karam,* the omissions followed advice of rights under *Mi-*

*randa.*[1] This distinction we deem superficial in light of defendant's waiver of those rights and voluntary election to speak. In *Anderson v Charles,* 447 US 404; 100 S Ct 2180; 65 L Ed 2d 222 (1980), the United States Supreme Court in reviewing a Michigan conviction for first-degree murder specifically held that omissions from voluntary statements given after the defendant had been arrested and advised of his *Miranda* rights are admissible to impeach the defendant's testimony. Although defendant here was not under arrest, *Anderson* is otherwise four-square with the present case and requires rejection of defendant's claim.

We do not know whether the Michigan Supreme Court will adhere to *Bobo* as a matter of state constitutional policy in light of intervening developments in federal constitutional law. See *People v Collier,* 426 Mich 23, 32, n 2; 393 NW2d 346 (1986). Until we do, we deem it appropriate to look to the United States Supreme Court for guidance.

Defendant's third issue—that he is entitled to be resentenced—is moot in light of our disposition.

Reversed and remanded.

---

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966).