PEOPLE v CETLINSKI (AFTER REMAND)

Docket No. 81176. Argued March 9, 1988 (Calendar No. 11). Decided
September 11, 1990.

Edward J. Cetlinski was convicted by a jury in the Lenawee
Circuit Court, Kenneth B. Glasser, Jr., J., of arson. The Court
of Appeals, BEASLEY, P.J., and HOLBROOK, JR., and L. F. SIM-
MONS, JJ., reversed in an unpublished opinion per curiam on
the ground that the prosecutor's question during cross-examina-
tion of the defendant regarding his failure to disclose a conver-
sation with a witness violated his right against self-incrimina-
tion in violation of *People v Bobo*, 390 Mich 355 (1973) (Docket
No. 98518). The people appeal.

In an opinion by Justice BOYLE, joined by Chief Justice RILEY
and Justices BRICKLEY and GRIFFIN, the Supreme Court *held:*

Use for impeachment purposes of a defendant's prior state-
ment, including omissions, given during contact with the police
prior to arrest or accusation does not violate the defendant's
rights as guaranteed under the Fifth and Fourteenth Amend-
ments or the Michigan Constitution.

1. Use of a defendant's prearrest, pre-*Miranda* statements,
including omissions, for impeachment purposes is a question of
relevancy, an evidentiary matter. For impeachment purposes,
failure to assert a material fact when formerly discussing the
subject matter is an assertion of the nonexistence of the fact.
Omissions from an affirmative voluntary response to questions
about the same subject matter about which the defendant
testified at trial do not constitute silence. Rather, they are prior
inconsistent statements that can be used for impeachment.
Such omissions are nonverbal conduct that is to be considered
an assertion of the nonexistence of a fact related in trial
testimony if a rational juror could draw an inference of incon-
sistency. An evidentiary approach to the use of such state-
ments, including omissions, will adequately protect the policy

REFERENCES

Am Jur 2d, Witnesses § 527.
See the Index to Annotations under Confessions and Admissions;
Impeachment of Witnesses.

interest in foreclosing the factfinder from unfair inferences of guilt.

2. In this case, the Court of Appeals erred in characterizing and analyzing the issue under a constitutional approach, in concluding that the Fifth Amendment precluded cross-examination of the defendant, and in reversing his conviction. The issue, rather, concerns the permissibility of cross-examination regarding the defendant's statements, including omissions, in light of the fact that he voluntarily made them to the police during a six-month investigation. The prosecutor did not ask the jury to infer guilt from the defendant's silence. Thus, the prosecutor's cross-examination did not violate the defendant's Fifth Amendment right not to incriminate himself. The use at trial of his prearrest, pre-*Miranda* statement for impeachment purposes was permissible under the federal and Michigan Constitutions.

Justice LEVIN, joined by Justices ARCHER and CAVANAGH, concurring in part and dissenting in part, concurred in the reversal of the judgment of the Court of Appeals because any error did not prejudice Cetlinski's defense and therefore does not require reversal of his conviction.

It is not necessary for decision in this case to decide whether *People v Bobo* should be construed coextensively with the minimal requirements of the United States Constitution. The stated reason for so deciding is to eliminate confusion in the law, but the Court's decision does not eliminate confusion.

It is not necessary for decision in this case to decide whether the prosecutor's cross-examination violated Cetlinski's rights under the Due Process Clause of the Fourteenth Amendment. It is inappropriate for the Court to decide that question without affording Cetlinski an opportunity to develop an evidentiary record that would substantiate a claim of error. When Cetlinski was tried, the exclusion of evidence of a defendant's silence did not depend on the factors that are dispositive in an analysis under the Due Process Clause.

A defendant's failure to volunteer information during a pretrial statement is admissible if there is some basis on which it can be said with a reasonable degree of certainty that the failure to volunteer information is probative with respect to some fact that tends to impeach the defendant's trial testimony. To be admissible as a prior inconsistent statement, a defendant's silence must have an assertive quality.

The more a defendant said about a given subject, the greater is the likelihood that the defendant's failure to volunteer particular information is probative. The more narrowly a de-

fendant confined the subject matter of his pretrial statements, the greater is the likelihood that his failure to mention a fact related to that narrow subject matter is probative.

If there is no reason to expect a person to have asserted a fact if the fact did exist, evidence of the person's failure to assert the fact during a pretrial statement does not tend to prove that the fact did not exist.

Reversed; conviction reinstated.

CRIMINAL LAW — TRIAL — IMPEACHMENT.

Use for impeachment purposes of a defendant's prior statement, including omissions, given during contact with the police prior to arrest or accusation does not violate the defendant's rights as guaranteed under the Fifth and Fourteenth Amendments or the Michigan Constitution (US Const, Ams V, XIV).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Nathan T. Fairchild,* Prosecuting Attorney, and *Jonathan L. Poer,* Assistant Prosecuting Attorney, for the people.

*John R. Minock* for the defendant.

AFTER REMAND

BOYLE, J. The issue raised in this case is whether *People v Bobo,* 390 Mich 355; 212 NW2d 190 (1973), precludes cross-examination regarding a prior statement, including omissions, to a police officer.[1]

In *People v Cetlinski*[2] the Court of Appeals held on initial appeal that the Fifth Amendment precluded asking the defendant during cross-examination why he had not told investigating officers, in the course of prearrest voluntary conversations with them regarding the fire, that he had had a conversation with his waitress and that the wait-

---

[1] This Court cannot avoid addressing this issue by concluding as Justice LEVIN does that the error did not prejudice the defendant's defense. *Post,* p 764.

[2] *People v Cetlinski,* unpublished opinion of the Court of Appeals, decided May 19, 1986 (Docket No. 83585).

ress had suggested the idea of burning Cetlinski's business. The court reversed the defendant's conviction. After our decision in *People v Collier,* 426 Mich 23; 393 NW2d 346 (1986), we remanded the case to the Court of Appeals for reconsideration in light of that decision.[3] On remand, the Court of Appeals adhered to its previous position, again concluding that *Bobo* required reversal and opining that *Collier* was inapplicable.[4]

Despite the fact that over the years the issue whether *Bobo* correctly construes the requirement of the Fifth Amendment and if not, whether the Michigan Constitution requires a higher standard has spawned a degree of conflict and confusion in the Court of Appeals,[5] and despite the fact that the precise issue before us has produced a conflict in the Court of Appeals with regard to whether *People v Collier* or *Bobo* applies to prior inconsistent statements,[6] Justice LEVIN asserts it is not necessary in this case to reach the Fifth Amendment issue or to address the due process requirements of the Fourteenth Amendment.

In *Jenkins v Anderson,* 447 US 231; 100 S Ct 2124; 65 L Ed 2d 86 (1980),[7] the United States Supreme Court held that the use of prearrest

---

[3] *People v Cetlinski,* 428 Mich 861 (1987).

[4] *People v Cetlinski (On Remand),* unpublished opinion per curiam of the Court of Appeals, decided June 8, 1987 (Docket No. 98518).

[5] This includes each Court of Appeals panel in the instant case and the companion cases, that concluded a reversal was dictated by the rationale in *Bobo. People v McReavy,* unpublished opinion per curiam of the Court of Appeals, decided January 14, 1987 (Docket No. 88620); *People v Sutton,* unpublished opinion per curiam of the Court of Appeals, decided April 24, 1986 (Docket No. 81069).

[6] *People v Wigfall,* 160 Mich App 765; 408 NW2d 551 (1987).

[7] If the Court of Appeals had based its decision on a subsidiary finding that the defendant had been given *Miranda (v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 [1966]) warnings, which it clearly did not, a finding of a violation of the Fifth Amendment would still be incorrect under federal law. *Fletcher v Weir,* 455 US 603; 102 S Ct 1309; 71 L Ed 2d 490 (1982) (per curiam).

silence for impeachment purposes did not violate the Fifth Amendment. Moreover, regardless of whether this case involved a situation in which the defendant's silence was used to impeach or one where the defendant made statements to the police, omitting some material facts, the critical events took place prearrest and pre-*Miranda*[8] and thus there could be no due process claim that the state unfairly used defendant's silence or omission against him at trial in violation of the implicit assurance in *Miranda* that silence will not be penalized. *Doyle v Ohio,* 426 US 610; 96 S Ct 2240; 49 L Ed 2d 91 (1976).[9]

We hold that the use for impeachment purposes of a defendant's prior statement, including omissions, given during contact with the police, prior to arrest or accusation, does not violate the defen-

---

[8] *Miranda,* n 7 *supra.*

[9] Justice LEVIN argues that the record is unclear whether Cetlinski received *Miranda* warnings during his various conversations with law enforcement personnel. Absent a factual finding whether the warnings were given and if so, when defendant received them, he asserts there cannot be an accurate determination whether the impeachment use of Cetlinski's prearrest silence violated the Due Process Clause. However, in *Fletcher v Weir,* 455 US 603; 102 S Ct 1309; 71 L Ed 2d 490 (1982), the United States Supreme Court made such a determination in a postarrest situation, holding that there was no due process violation in the prosecutor's use of a defendant's postarrest silence for impeachment purposes, and clarifying that *Doyle* is applicable only if the issue involves post-*Miranda* silence.

The *Fletcher* Court did not base its decision on a factual finding that *Miranda* warnings were not given. Rather it stated that the record was unclear whether the defendant had received such warnings and noted that "[t]he significant difference between the present case and *Doyle* is that the record does not indicate that respondent Weir received any *Miranda* warnings during the period in which he remained silent immediately after his arrest." *Id.,* p 605.

In *Doyle,* the Court held the impeachment use of a defendant's post-*Miranda* silence violated the Due Process Clause because the defendant had relied on the implicit governmental assurance in the *Miranda* warnings that his silence would not be used against him. Absent evidence of *Miranda* warnings in the record, there simply is no *Doyle* error. This was true in *Fletcher* and is true in *Cetlinski* also. Justice LEVIN's statement that such factual findings should precede a determination of whether the cross-examination violates the Due Process Clause is simply incorrect. (*Post,* pp 769–770.)

dant's constitutional rights as guaranteed under the Fifth and Fourteenth Amendments or the Michigan Constitution. Indeed, long before *Jenkins v Anderson,* the United States Supreme Court had held the Fifth Amendment was not violated by impeachment of a testifying defendant with voluntarily given prior inconsistent statements. *Harris v New York,* 401 US 222; 91 S Ct 643; 28 L Ed 2d 1 (1971). The use of a defendant's prearrest, pre-*Miranda* "statements" for impeachment purposes is one of relevancy, an evidentiary matter.[10] The threshold inquiry is whether this evidence makes "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. See *Collier, supra,* p 36.

This analysis is consistent with the United States Supreme Court's ruling in *Jenkins.* There the Court emphasized that

> [i]mpeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial. . . . Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted. 3A J. Wigmore, Evidence, § 1042, p 1056 (Chadbourn rev 1970). Each jurisdiction may formulate its own rules of evidence to determine when prior silence [or statements, including omissions] is so inconsistent with present statements that impeachment by reference to such silence [or statements] is probative [of defendant's credibility]. [*Id.,* pp 238-239.]

The statement of a party opponent is defined as

---

[10] Consequently, this defendant's conviction cannot be reversed unless the court determines whether there was an evidentiary error and if so, whether the admission of the evidence constituted a "miscarriage of justice." MCL 769.26; MSA 28.1096.

an oral or written assertion or nonverbal conduct, MRE 801(d)(2). For impeachment purposes, the failure to assert a material fact when formerly narrating on the matter now dealt with amounts to an assertion, or statement, of the nonexistence of the fact.[11] Thus, as an evidentiary matter, omissions from an affirmative voluntary response to questions about the same subject matter testified to at trial do not constitute "silence."[12] Rather, they are "prior inconsistent statements," and can be used to impeach testimony at trial in which the witness admitted the fact's existence. As the *Jenkins* Court noted, the "[u]se of such impeachment on cross-examination allows prosecutors to test the credibility of witnesses by asking them to explain prior inconsistent statements and acts." *Id.,* p 238.[13]

---

[11] See 3 Weinstein & Berger, Evidence, ¶ 607[06], pp 607-97 to 607-98. See also 3A Wigmore, Evidence (Chadbourn rev), § 1042, pp 1056-1058.

[12] As the United States Supreme Court said in *Anderson v Charles,* 447 US 404, 409; 100 S Ct 2180; 65 L Ed 2d 222 (1980), "[e]ach of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version [but] [t]he questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement."

Moreover, this Court itself has unanimously recognized the rule in *Anderson* as a proper interpretation of our own rules of evidence. In *People v Cole,* 411 Mich 483; 307 NW2d 687 (1981), we held that cross-examination of the defendant with regard to her failure to include certain details in a prior inconsistent statement was permissible under the Michigan Rules of Evidence. This Court found the *Cole* situation was similar to that confronted by the United States Supreme Court in *Anderson v Charles, supra,* and noted that " 'cross-examination that merely inquires into prior inconsistent statements . . . makes no unfair use of silence . . . . As to the *subject matter* of his statements, the defendant has not remained silent at all.' " *Cole,* p 488. (Emphasis added.)

[13] See also 3 Weinstein & Berger, Evidence, ¶ 607[06], p 607-101:

The approach of relying during cross-examination on a failure of a witness to tell all the details of his observations at a preliminary interview or proceeding is often used by defense counsel . . . . [*Id.*]

As stated above, when an individual has not opted to remain silent, but has made affirmative responses to questions about the same subject matter testified to at trial, omissions from the statements do not constitute silence. The omission is nonverbal conduct that is to be considered an assertion of the nonexistence of the fact testified to at trial if a rational juror could draw an inference of inconsistency. To be sure, the witness may explain the omission by a desire not to implicate himself or because of a lapse of memory. Such explanations, however, do not remove the relevance of the inconsistency.

On this record, however, the majority is persuaded that evidentiary error, if any, was not prejudicial to the defendant. Accordingly, we reverse the decision of the Court of Appeals and reinstate the defendant's conviction.

I

On December 11, 1983, a fire destroyed a bar that the defendant owned and managed adjacent to the motel in which he and a woman companion lived. After almost six months of investigation, the defendant was charged with burning real property and burning insured property.

At trial the expert fire investigator's testimony revealed that the fire had been set intentionally by spreading kerosene throughout the bar. In addition, having found the bar locked at the time of the fire, the investigator concluded the fire was set by someone with a key to the bar. Only five people had keys to the bar, the defendant, his live-in girl friend and business partner, the bartender on duty that night, a friend who had borrowed defendant's car, and a waitress.

The waitress testified for the prosecution that

about three months prior to the actual fire, the defendant and she had discussed burning down the bar, the details of how he wanted the fire to be set, and how defendant wanted the scene to appear to investigators. She also testified that defendant asked her if she knew anyone that would burn the bar and that he could pay $500 for the fire to be set after he received the insurance money. She stated that she told the defendant she would talk to her brother and that when she approached her brother about this he told her to stay out of it and to tell the defendant that it cost $5,000, more than defendant, wished to pay. When she relayed the message to defendant, she said he told her to forget it.[14]

When defendant Cetlinski took the stand, in exculpation on direct examination, he stated while looking at the jury that he had discussed burning the bar with the waitress "as a joke." Further, he stated that it was she who first brought up the idea, that it was her idea to check on what the cost would be, and that after about a week she told defendant her brother said he knew someone who would burn the bar if the defendant wanted it done.[15] Although stating he only had joked with the waitress about burning the bar, the defendant testified that he later discussed the conversation with his girl friend and business partner, and that he agreed with her that it would be wrong. He then stated that he told his girl friend that "[W]e're going to go talk to [her] and tell her we don't want it burned. I told her [the waitress] two

[14] The witness also stated that a couple times after that the defendant again told her to forget it and that she had assured him it was forgotten.

[15] The defendant testified that right after the waitress began working for him, one day when the two of them were by themselves in the bar, she suggested that she call someone and check on the possibility of having someone burn the bar.

or three days in a row I don't want it burned . . . .
I says, that's it."

This testimony served not only to rebut the
waitress' testimony, but to suggest that she com-
mitted the arson and that defendant himself had
nothing to do with the burning of the bar. Other
proofs showed that she was one of four people who
had keys to the bar and that she was present at
the time of the fire.

The defendant also described being awakened by
the police at his motel room next to the bar on the
night of the fire, and stated he answered what the
Court of Appeals characterized as "general investi-
gation questions" at that time, as well as at vari-
ous times during the course of the investigation.[16]
It is undisputed that defendant gave generally
exculpatory statements to the police during this
period of time.

During cross-examination, the defendant testi-
fied that after the waitress suggested she knew
someone who could burn the bar and that it could
be made to look like a robbery, he had had a
second conversation with her about a week after
the first one, and it was at that time that she
talked about price. Then, after his testimony estab-
lished the fact that after the fire the bar looked
exactly as the waitress had testified that she and
the defendant had discussed it should look, the
prosecutor asked the following question:

> Q. Mr. Cetlinski, after the fire when you saw
> these things out there, why didn't you tell the
> police about this conversation [the waitress] had
> had with you?
> A. Because it was just . . .

Defense counsel objected and, after the jury was

---

[16] The defendant was not under arrest, nor was there any claim
that he was the focus of the investigation.

removed, moved for a mistrial on the basis that
the prosecutor's question infringed upon defen-
dant's constitutional right to refrain from incrimi-
nating himself.

In response, the prosecutor argued that the
defendant took the stand, testified, gave numerous
voluntary statements to the police officers concern-
ing the fire and its possible origin, and, thus, that
the state had the right to inquire why defendant
never told police about the conversation with the
waitress. The trial judge recessed until the follow-
ing morning and instructed the attorneys to re-
search the law and that he would make a ruling at
that time. The following day the court determined
that on the basis of the fact that defendant talked
freely to the police there was no issue of silence in
the case and denied defense counsel's motion for
mistrial.[17]

The prosecutor was permitted to resume ques-
tioning:

> *Q.* Mr. Cetlinski, during the course of the inves-
> tigation of this fire at your bar, you talked to the
> police officers a number of times; isn't that cor-
> rect?
> *A.* Yes.
> *Q.* Different officers at different times?
> *A.* Yes.
> *Q.* During any of the course [sic] of those conver-
> sations with those officers, did you ever mention to
> them this conversation you had with [the wait-
> ress]?
> *A.* No.
> *Q.* You didn't tell them about that at all?
> *A.* No.
> *Q.* Why didn't you tell them about that at all?

---

[17] The defendant made no objection that there was an insufficient
foundation to determine whether there was an inconsistency between
the contents of the prior statements and defendant's trial testimony.

*A.* I didn't—I forgot about it.

The prosecutor never again raised the issue with the defendant or any other witness, or made reference during closing argument to defendant's failure to tell police of the conversation with his employee.[18] Defense counsel argued during closing argument that the prosecutor's question regarding the defendant's failure to tell police about the conversation was unfair because there was no claim that defendant failed to answer all of the questions during the investigation or that he ever lied to anyone. Further, defense counsel noted that even if the waitress' version of the conversation was correct "she had all kind [sic] of motivation [to lie] including her fight with [the defendant's girl friend's] son . . . ."

At the conclusion of the four-day trial, the defendant was convicted by a jury of burning insured property, MCL 750.75; MSA 28.270. On March 7, 1985, the defendant was sentenced to five years probation, with the first year to be served in the Lenawee County Jail.

On initial appeal, the Court of Appeals held that the cross-examination by the prosecutor regarding the defendant's "pre-arrest" failure to tell the investigating officer, "at the scene" "immediately after he and [his companion] were awakened," about his prior conversation violated "defendant's constitutional right against self-incrimination" under the rule of *Bobo*.[19] Although noting "*Bobo* had

[18] Defense counsel never requested any special instruction regarding the questioning and testimony of the defendant concerning his failure to mention the conversation with the employee to the police.

[19] The Court found this language of *Bobo* literally required such a conclusion:

We will not condone conduct which directly or indirectly restricts the exercise of the constitutional right to remain silent

been appropriately limited and defined in recent decisions of this court . . . in the light of subsequent decisions of the United States Supreme Court," the panel concluded nonetheless that *Bobo* required reversal.[20]

After this Court held in *Collier* that impeachment with "prearrest silence" was not constitutionally precluded, *Cetlinski* was remanded to the Court of Appeals. On remand, the Court of Appeals again reversed on the basis of *Bobo*. It distinguished *Collier* on the ground that Collier was cross-examined regarding his failure to report to the police, prior to any contact with the police, a crime of which he had allegedly been the victim. The panel interpreted *Collier* only as limiting the *Bobo* holding

> "to those situations where the state seeks to impeach a defendant with his silence maintained *during contact with police officers.* Here, the prosecutor impeached defendant regarding his failure to report a robbery to the police. *There was no questioning or mention of defendant's silence at or after his contact with the police.*" [Citing *Collier, supra,* p 31. Emphasis added.]

Therefore, because "defendant [Cetlinski] was in contact with the police, and the police were ques-

---

in the face of accusation. "Nonutterances" are not statements. The fact that a witness did not make a statement may be shown only to contradict his assertion that he did.

\* \* \*

*Whether his silence was prior to or at the time of arrest makes little difference—the defendant's Fifth Amendment right to remain silent is constant.* [*Bobo, supra,* pp 359-360. Emphasis added.]

[20] The panel believed that none of the decisions limiting the rule of *Bobo* were applicable to the present case. See, e.g., *People v Karam,* 106 Mich App 383; 308 NW2d 220 (1981), lv den 414 Mich 870 (1982); *People v Lane,* 127 Mich App 663; 339 NW2d 552 (1983).

tioning him during their investigation," the panel concluded *Collier* did not require a different result in this case.

Thus, the Court of Appeals, post-*Collier,* erroneously held that *Bobo* prevents impeachment of a testifying defendant with a prior inconsistent statement made voluntarily to the police prior to arrest and during general investigatory questioning.

II

The decision in *People v Cetlinski* is evidence that this Court must respond to the issues the Court of Appeals has identified and the parties have briefed and argued, and speak to an issue which has been the subject of a sixteen-year effort by the trial and appellate judges of this state: to understand and apply this Court's pronouncements in *Bobo.*

Understanding and analysis of the *Bobo* issue requires that we initially explain the facts, holding, and dicta of *Bobo,* and that we then acknowledge federal authority which casts doubt on the Fifth Amendment rationale of that opinion. The Court in *People v Bobo, supra,* pp 359-361, opined that the Fifth Amendment of the United States Constitution precluded any reference to a defendant's silence under any circumstances during a trial:[21]

> We will not condone conduct which directly or indirectly restricts the exercise of the constitutional right to remain silent in the face of accusation. "Nonutterances" are not statements. The fact

[21] Justice LEVIN's opinion fails to acknowledge this primary reliance on the Fifth Amendment, thus permitting or suggesting the clearly incorrect theory that *Bobo* allows an evidentiary analysis of the relevancy of a witness' failure to make certain statements.

that a witness did not make a statement may be
shown only to contradict his assertion that he did.

\* \* \*

What concerned the parties and what prompted
our grant of leave was the propriety of using the
fact of defendant's silence either as evidence of
guilt or for the purpose of impeachment.

Whether his [defendant's] silence was prior to or
at the time of arrest makes little difference—the
defendant's Fifth Amendment right to remain si-
lent is constant.

\* \* \*

It is unimportant whether the accuser be a
police officer or not. Manifestly whenever a person
is stopped for interrogation by the police, whether
technically under arrest or not, the Fifth Amend-
ment guarantees that his silence may not be used
against him.

Although the factual context of the holding in
*Bobo* was the prosecutor's use of the defendant's
prearrest silence during contact with a police offi-
cer to impeach the defendant's exculpatory testi-
mony at trial, the Court of Appeals subsequently
applied the rationale of *Bobo* to both pre- and
postarrest silence, to substantive and impeach-
ment use of "silence," and to contact with police
officers or citizens.[22]

This Court's first consideration of the question
whether the federal or the state constitution gov-
erns the permissible use of a criminal defendant's
silence came thirteen years after *Bobo* and after a
substantial body of federal precedent had con-
strued the Fifth Amendment.[23] *People v Collier,*

[22] *People v Ray,* 119 Mich App 724; 326 NW2d 622 (1982); *People v
Hoshowski,* 108 Mich App 321; 310 NW2d 228 (1981); *People v Wade,*
93 Mich App 735; 287 NW2d 268 (1979).

[23] During this period, the Court of Appeals had issued in excess of
eighty published opinions involving the *Bobo* issue, all without guid-
ance from this Court.

*supra.* In *People v Collier,* we held that neither the Fifth Amendment nor the Michigan Constitution precluded the use of prearrest silence for impeachment purposes.

The Court recognized that the United States Supreme Court had held that the Fifth Amendment did not preclude cross-examination of a testifying defendant with prearrest silence, *Jenkins v Anderson, supra,* and declined to find a violation of either due process or self-incrimination protection under the Michigan Constitution:

> For us to find that this case invokes the Michigan Constitution would require us to differ with the *Jenkins* majority's analysis in a prearrest silence impeachment situation involving a factual setting less favorable to the defendant than that in *Jenkins.* Not only is there no federal Fifth Amendment precedent for such a finding, we are also aware of no other state that has taken such a step in the interpretation of its own self-incrimination provision. We have been offered no satisfactory arguments why we should be the first to use our own constitution to so enlarge upon existing Fifth Amendment jurisprudence.
>
> \*   \*   \*
>
> We conclude that to the extent *Bobo* is viable it is confined to impeachment for and comment on silence *at the time of arrest in the face of accusation.* [*Collier, supra,* pp 38-39. Emphasis added.]

In *Collier,* we concluded that the issue of prearrest silence is one of relevancy and that the Court of Appeals had erroneously construed *Bobo.* However, while our holding in *Collier* limited *Bobo* to impeachment for and comment on silence at the time of arrest in the face of accusation, this Court did not overrule *Bobo,* but rather found *Bobo* inapplicable on the facts. Thus, a continuing question exists with regard to whether *Bobo* is to be

understood and applied consistent with intervening developments in Fifth and Fourteenth Amendment jurisprudence.[24] Indeed, confusion regarding this question may actually have increased since *Collier.* Prior to *Collier,* a substantial number of panels of the Court of Appeals had recognized a distinction between the use of silence for impeachment and impeachment with prior prearrest statements inconsistent with trial testimony, and held that *Bobo* was inapplicable to prearrest statements.[25] The Court of Appeals panel in the case at bar characterized the prosecutor's reference to defendant's prior pretrial statements, including omissions, as *Bobo* "silence" and thus is convincing contemporary evidence of the need for further clarification of this area of the law.

III

*People v Cetlinski* is the only case before us in which this Court has asked the Court of Appeals to redetermine the admissibility of a defendant's statements, including omissions, in light of the limitation of *Bobo* set forth in *People v Collier.*[26] The Court of Appeals reversed the defendant's conviction on the basis of its finding that the use at trial of the defendant's prearrest, pre-*Miranda* "silence" for impeachment purposes was improper under the rule of *Bobo.*[27]

---

[24] Compare *People v Cetlinski (On Remand),* n 4 *supra,* with *People v Wigfall,* n 6 *supra,* p 780, in which the Court of Appeals held that in the absence of further guidance from this Court, "we deem it appropriate to look to the United States Supreme Court for guidance."

[25] *People v Wells,* 102 Mich App 558; 302 NW2d 232 (1980), lv den 417 Mich 916 (1983); *People v Fortuin,* 143 Mich App 279; 372 NW2d 530 (1985); *People v Gant,* 55 Mich App 510; 222 NW2d 784 (1974).

[26] *People v Cetlinski,* 429 Mich 858 (1987).

[27] Contrary to the finding by the Court of Appeals on initial appeal, the questioning by the prosecutor was not limited to the time period

At the outset, it must be recognized that the Court of Appeals erred in characterizing and analyzing the issue under a constitutional approach. As stated above, there was no constitutional error. The issue involved is cross-examination designed to test the veracity of in-court assertions by comparison with out-of-court statements, including omissions, and is properly analyzed under an evidentiary approach only. Because the broad *Bobo* rationale arguably supports the Court of Appeals mischaracterization of the question, we again observe, as we did in *Collier, supra,* that, in light of both pre- and post-*Bobo* decisions of the United States Supreme Court, it is clear that the Fifth Amendment rationale no longer supports the *Bobo* rationale. Thus, no error of federal constitutional law occurred. Because the Court of Appeals finding of error under *Bobo* is sustainable only if the Michigan Constitution requires a higher standard, we also address that issue.[28]

Consistent with our rationale in *Collier,* we conclude that an evidentiary approach to the use of a defendant's prearrest, pre-*Miranda* statements, including omissions, will adequately protect the policy interest in foreclosing the factfinder from unfair inferences of guilt. We therefore construe *Bobo* as being coextensive with the Fifth Amendment of the United States Constitution and the due process analysis of *Doyle v Ohio,* 426 US

immediately after defendant was awakened by the police the night of the fire.

[28] On remand, the Court of Appeals held that *Bobo* precludes impeachment with silence during a prearrest investigation by the police. However, we clearly had stated in *Collier, supra,* p 39, that *Bobo* "is confined to impeachment for and comment on silence at the time of arrest in the face of accusation." Because the Fifth Amendment would permit impeachment and comment, the Court of Appeals finding of error can only be sustained if *Bobo* rests on an independent state constitutional ground.

610; 96 S Ct 2240; 49 L Ed 2d 91 (1976).[29] The use of a defendant's silence during contact with the police that does not occur "at the time of arrest in the face of accusation," *Collier,* p 39, for impeachment purposes does not violate the Fifth Amendment or the Michigan Constitution.[30]

*People v Collier* adopted the evidentiary rule that nonverbal conduct by a defendant, a failure to come forward, is relevant and probative for impeachment purposes when the court determines that it would have been "natural" for the person to have come forward with the exculpatory information under the circumstances.[31] Because a defendant has no duty to come forward, the Court observed that his failure to do so was so ambiguous that it did not in and of itself allow a trial

[29] This Court has emphasized a receptivity to independent examination of the meaning of our own constitution. That inquiry invites, at a minimum, public policy reasons or prior decisions of this Court which would require a different interpretation. See *Paramount Pictures Corp v Miskinis,* 418 Mich 708; 344 NW2d 788 (1984); *People v Nash,* 418 Mich 196; 341 NW2d 439 (1983).

However, to the extent that *Bobo* was based upon an understanding of the Fifth Amendment in excess of the now clearly defined constitutional standard, "[W]e decline to now convert our past misunderstandings of *Miranda* into an interpretation of that provision." *People v Hill,* 429 Mich 382, 392; 415 NW2d 193 (1987).

To the extent *Bobo* was based on this Court's ruling in *People v Bigge,* 288 Mich 417; 285 NW 5 (1939), we find that that case has no application to the facts of the instant case. See n 35, p 763.

[30] In regard to the issue whether defendant's rights guaranteed under the Fourteenth Amendment were violated, Justice LEVIN's discussion of *Doyle, supra,* is curious, given the fact that this defendant has never asserted, nor does the record support such a finding, that the prosecutor cross-examined the defendant about his failure to tell the police about the conversation with his employee after he was given *Miranda* warnings. There has never been a suggestion or a finding that the "silence at issue" (that is, the omission of the defendant's conversation with Rodriquez from his conversations with the police) occurred after receipt of *Miranda* warnings. See n 9.

[31] As a general rule of evidence, prior silence of a witness with regard to a fact to which he has testified, where such silence occurs under circumstances in which he would be expected to speak out, may be used to impeach during cross-examination. 3A Wigmore, Evidence (Chadbourn rev), § 1042, p 1056.

judge to conclude that it amounted to an assertion of the nonexistence of the fact testified to. Thus, where the prosecutor's theory of impeachment is that the defendant is not telling the truth because he did not come forward and offer what he now testifies to, we held that a trial court properly permits impeachment if it would have been natural and expected for the defendant to come forward with the story he relates during trial.[32] In doing so, we necessarily concluded that the mere failure to come forward did not permit a rational juror to draw an inference as to credibility. We also necessarily recognized that nonverbal conduct, the failure to come forward, could be conduct inconsistent with trial testimony.

The issue in this case concerns the permissibility of cross-examination about defendant's statements, including omissions, in light of the fact that the defendant voluntarily gave those statements to the police during a six-month investigation. A majority of the justices are persuaded that the record is insufficient to permit us to determine whether there was evidentiary error[33] because the record was developed pre-*Collier* and thus failed to address factors later made critical under the evidentiary analysis enunciated in *Collier.* Therefore, we

---

[32] *Jenkins v Anderson, supra,* p 240, established that the state may allow impeachment with prearrest silence without infringing upon federal constitutional rights, emphasizing "[e]ach jurisdiction remains free to formulate evidentiary rules defining the situations in which silence is viewed as more probative than prejudicial." See also 3 Weinstein & Berger, Evidence, ¶ 607[06], p 607-99.

With regard to this type of cross-examination, designed to shed light on the credibility of a defendant's direct testimony, the test of relevancy is not whether the answer sought will prove the main issue, but whether it will be useful and aid the jury in appraising the credibility of the witness and assess the probative value of the direct testimony. McCormick, Evidence (3d ed), § 29, p 63.

[33] A majority of the justices is persuaded that the record is insufficient to allow a comparison between in-court assertions and out-of-court statements under an evidentiary approach.

might remand for development of an evidentiary record were we not also persuaded that error, if any, was not prejudicial to the defendant.[34] The jury had before it both the waitress' and Cetlinski's version of their conversations about burning Cetlinski's business. The challenged questioning by the prosecution played a very small role in the defendant's trial, and the other evidence presented at trial was more than sufficient to allow the jury to find Cetlinski guilty beyond a reasonable doubt. Furthermore, it was only the defense counsel who raised the issue of the defendant's failure to inform the police of these conversations in closing argument. Thus, we are persuaded error, if any, did not prejudice Cetlinski's defense or affect the outcome in this case. Therefore, we reverse the judgment of the Court of Appeals and reinstate the defendant's conviction.

## CONCLUSION

The Court of Appeals erred in concluding that the Fifth Amendment precluded the cross-exami-

---

[34] Although we do not address the question whether it would have been "natural" for the defendant to mention the waitress' conversation with him in the immediate wake of the fire, we note that the responding opinion continues to place undue focus on that time in its evidentiary analysis. This question must be considered in light of the fact that the prosecutor's inquiry to the defendant was why he had not mentioned this version of the conversation during the numerous times he talked with different police officers at different times during the subsequent *six-month* investigation.

Justice LEVIN finds that

[o]n the present record, we would hold that Cetlinski's failure to mention the conversation did not have probative value because it would not have been natural for Cetlinski to have volunteered the information. We would hold, in agreement with the Court of Appeals, that the prosecutor's cross-examination was improper. [*Post,* p 781.]

In contrast we find that on this record, we cannot decide whether there was *Collier* error.

nation of the defendant and, on the basis of that conclusion, in reversing the defendant's conviction. The prosecutor did not ask the jury to infer guilt from the defendant's silence.[35] Thus, the prosecutor's cross-examination did not violate this defendant's right not to incriminate himself as guaranteed under the Fifth Amendment. Construing *Bobo's* constitutional foundation as coextensive with federal law, the use at trial of a defendant's prearrest, pre-*Miranda* statement for impeachment purposes was permissible under the federal and Michigan Constitutions.

Finally, although the defendant objected to the impeachment use of his prearrest, pre-*Miranda* statements on constitutional ground, but not on an evidentiary basis, error, if any, was not prejudicial to the defendant. Accordingly, we reverse the judgment of the Court of Appeals and reinstate the defendant's conviction.

RILEY, C.J., and BRICKLEY and GRIFFIN, JJ., concurred with BOYLE, J.

LEVIN, J. (*concurring in part and dissenting in part*). Edward Cetlinski was convicted of arson.[1] The issue presented concerns the *impeachment*[2]

---

[35] Therefore, the holding of *People v Bigge*, n 29, *supra*, where the Court found error requiring reversal in the use of a defendant's silence as substantive evidence of his guilt, has no application to the circumstances of the present case. *Id.*, p 430. In *Bigge*, this Court found that the prosecutor's allegation during the opening statement that the unanswered allegation by another that the defendant was guilty of embezzlement was proof the defendant was guilty, was just as prejudicial to a defendant as testimony of a former plea of guilty would be on the trial of the case if the defendant had pleaded guilty and then changed his plea. *Id.*, p 431.

[1] MCL 750.75; MSA 28.270.

[2] The issue in the companion case of *People v McReavy*, 436 Mich 197; 462 NW2d 1 (1990), concerns the *substantive* use of McReavy's failure during postarrest, post-*Miranda* interrogation to respond to questions regarding his involvement in a robbery/kidnapping. *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

use of his failure during investigative interviews with police and fire personnel to volunteer that he had discussed the possibility of hiring someone to set fire to his property.

The Court of Appeals reversed Cetlinski's conviction on the ground that the impeachment use of his failure to volunteer that he had discussed the possibility of hiring someone to set fire to his property violated the rule stated in *People v Bobo,* 390 Mich 355; 212 NW2d 190 (1973). Because we conclude that any error did not prejudice Cetlinski's defense, we concur in the reversal of the judgment of the Court of Appeals.

I

Cetlinski owned a bar. The bar burned down. Cetlinski was convicted of arson.

During the prosecution's case in chief, Gloria Rodriquez, one of Cetlinski's former employees, testified that Cetlinski had on one occasion discussed with her the possibility of setting fire to the bar and that he had asked her if she knew anyone who would set the fire.[3] Rodriquez added that on

The issue in the companion case of *People v Sutton (After Remand),* 436 Mich 575; — NW2d — (1990), concerns the *impeachment* use of Sutton's failure to come forward and inform the police that he had shot someone but that it was an accident, and of his postarrest, post-*Miranda* silence.

I would not release the opinions in this case until the Court is prepared to release the opinions in the companion cases.

[3] According to Rodriquez, this conversation took place two or three months before the fire. According to Cetlinski, the conversation took place in June or July of 1983, which was five or six months before the fire. Rodriquez also testified that Cetlinski said he would pay the arsonist $500 from the insurance proceeds. Cetlinski denied making such a statement.

In Rodriquez' account, Cetlinski described how the fire should be set. In Cetlinski's version, such details were not discussed. The manner in which the fire was actually set corresponded to the description allegedly given by Cetlinski.

several occasions Cetlinski had told her to forget about setting fire to the bar.

On direct examination, Cetlinski acknowledged the conversation with Rodriquez whom he characterized as the initiator. He testified generally that he was not serious about hiring someone to set fire to the bar. Cetlinski said that on several occasions he told Rodriquez to forget about setting a fire.

On cross-examination, Cetlinski characterized as a joke the conversation during which he had asked if Rodriquez knew anyone who would set a fire. He added that it was out of curiosity that he asked Rodriquez to make inquiries about hiring an arsonist. The prosecutor asked Cetlinski about his failure to mention the conversation with Rodriquez during his discussions with police and fire investigators.

The prosecutor's initial question was directed to discussions with investigators immediately after the fire.[4] Cetlinski's lawyer objected and moved for a mistrial; the motion was denied and the objection was overruled. The prosecutor then resumed his previous line of inquiry. This time, his questions covered a broader time frame.[5]

---

[4] *Q.* Mr. Cetlinski, after the fire when you saw these things out there, why didn't you tell the police about this conversation [the waitress] had had with you?

*A.* Because it was just . . .

[5] *Q.* Mr. Cetlinski, during the course of the investigation of this fire at your bar, you talked to the police officers a number of times; isn't that correct?

*A.* Yes.

*Q.* Different officers at different times?

*A.* Yes.

*Q.* During any of the course [sic] of those conversations with those officers, did you ever mention to them this conversation you had with [the waitress]?

*A.* No.

*Q.* You didn't tell them about that at all?

*A.* No.

The Court of Appeals reversed Cetlinski's conviction on the ground that the cross-examination violated the rule stated in *Bobo*.[6] This Court vacated the judgment of the Court of Appeals and remanded the case for reconsideration in light of *People v Collier*, 426 Mich 23; 393 NW2d 346 (1986).[7] On remand, the Court of Appeals adhered to its earlier decision.[8]

II

We agree with the majority that the decision of the Court of Appeals should be reversed. Any error in the prosecutor's cross-examination did not prejudice Cetlinski's defense and therefore does not require reversal of his conviction.

Rodriquez' testimony regarding her discussion with Cetlinski was properly introduced in the prosecution's case in chief. Cetlinski testified on direct examination that he was not serious about hiring someone to set fire to his bar, and on cross-examination that the conversation with Rodriquez was a joke. The prosecutor then brought out that Cetlinski had not mentioned the conversation to the police. Cetlinski's explanation for having failed to do so was that he "forgot about it."

If the jurors believed Cetlinski's testimony that the conversation was intended as a joke, they would not have expected him to have mentioned the conversation to the police and they would not have drawn any adverse inference from his failure

*Q.* Why didn't you tell them about that at all?
*A.* I didn't—I forgot about it.

[6] *People v Cetlinski*, unpublished opinion per curiam of the Court of Appeals, decided May 29, 1986 (Docket No. 83585).

[7] *People v Cetlinski*, 428 Mich 861 (1987).

[8] *People v Cetlinski (On Remand)*, unpublished opinion per curiam of the Court of Appeals, decided June 8, 1987 (Docket No. 98518).

to do so.[9] If the jurors did not believe Cetlinski's testimony that the conversation was intended as a joke, disclosure of Cetlinski's failure to mention the conversation would not have *caused* them to draw an inference concerning guilt because they would already have drawn that inference as a consequence of their decision not to believe his exculpatory explanation for the conversation. Thus, the evidence of Cetlinski's "silence" could not have significantly[10] prejudiced his defense.

On the facts of this case, we conclude that any error does not require reversal.[11]

No more needs to be said to decide this case.

### III

Although the majority acknowledges that resolution of the merits is not necessary for decision in the instant case,[12] it nonetheless chooses to selectively address other "issues."

### A

The majority in effect overrules *People v Bobo,* holding that *Bobo* is henceforth to be construed as a superfluous reference to the minimal require-

[9] Cetlinski's "silence" was consistent with his version of the conversation with Rodriquez.

[10] The evidence of Cetlinski's "silence" might have confirmed conclusions concerning his guilt that members of the jury had already reached. It is thus possible that the evidence substantiated an inference that would have been impermissible if based on Cetlinski's "silence" alone.

Any undue prejudice from this use of Cetlinski's silence was significantly less harmful than the prejudice from Rodriquez' testimony regarding her conversation with Cetlinski and from Cetlinski's admissions regarding the conversation.

[11] The majority agrees with this assessment of the record. See *ante,* p 759.

[12] See n 11.

ments of the United States Constitution,[13] whatever they may be.

We will not belabor stare decisis. A majority of the Court can overrule a precedent for a good reason, a bad reason, or no reason at all. The majority's stated reason for overruling *Bobo* is to eliminate confusion in the law. That might be a persuasive reason for overruling *Bobo* if the majority's decision eliminated or reduced confusion instead of replacing one form of possible confusion with another.

We continue to believe that "because the United States Supreme Court does not require us to do so" is not a valid reason for overruling precedents of this Court that provide greater protection to accused persons than the minimum protection mandated by the federal Constitution. When the United States Supreme Court rules that a particular state court practice does not violate the United States Constitution, it does not thereby express an opinion on whether the practice is a sound practice or recommend its adoption by other state courts or even the federal courts.[14]

The notion that this Court should automatically retreat from its precedents to the extent it can do so without running afoul of the minimum requirements of the United States Constitution amounts, in effect, to an assertion that the best policy is whatever the United States Supreme Court will allow the state with the lowest standard to get

[13] See *ante,* pp 759-760 and 763.

[14] See, generally, 76 ABA J 27 (August, 1990), where Chief Justice Burger commented:

"Many lawyers, upon hearing a condemnation of advertising, will say, 'Well the Supreme Court said it's all right to do it.' The Supreme Court said no such thing. The fact that the Constitution permits particular conduct does not mean that it's professionally appropriate to engage in that conduct."

away with. We dissent from the race to the bottom.[15]

**B**

The majority also declares that the prosecutor's cross-examination did not violate Cetlinski's rights under the United States Constitution.[16]

When a defendant remains silent after the receipt of *Miranda* warnings, the Due Process Clause generally bars the impeachment use of the defendant's silence. *Doyle v Ohio,* 426 US 610; 96 S Ct 2240; 49 L Ed 2d 91 (1976).[17] Thus, if the prosecutor's inquiry on cross-examination referred to post-*Miranda* discussions with police and fire investigators, there might have been a constitutional violation.

The record is unclear whether, and if so, when, Cetlinski received *Miranda* warnings during his various conversations with law enforcement personnel.

Factual findings whether, and if so, when, Cetlinski received *Miranda* warnings should precede a determination of whether the prosecutor's cross-examination referred to both pre- and post-*Miranda* "silence" and was therefore impermissibly broad.[18] Without such factual findings, there is not

[15] We also disagree with this aspect of the Court's ruling for the reasons set forth in part v.

[16] See *ante,* pp 745, 759, and 763.

[17] When a defendant's silence occurs before the receipt of *Miranda* warnings, the Due Process Clause does not bar impeachment with the defendant's silence. See *Jenkins v Anderson,* 447 US 231; 100 S Ct 2124; 65 L Ed 2d 86 (1980), and *Fletcher v Weir,* 455 US 603; 102 S Ct 1309; 71 L Ed 2d 490 (1982).

[18] When confronted with prosecutorial cross-examination that does not clearly distinguish between pre- and post-*Miranda* silence, courts have found *Doyle* error. *United States ex rel Allen v Franzen,* 659 F2d 745, 748 (CA 7, 1981), *State v Wells,* 229 Neb 89, 100; 425 NW2d 338 (1988), and *State v Lofquest,* 227 Neb 567, 570; 418 NW2d 595 (1988).

an adequate predicate for a determination of whether the cross-examination in fact violated the Due Process Clause.

The majority declares, without factual findings, that the prosecutor's cross-examination did not violate Cetlinski's rights under the Due Process Clause. The majority begins with the purposeful assumption that the prosecutor's inquiry was limited to the pre-*Miranda* time frame,[19] an assumption that the majority seeks to justify on the bases that the record is unclear whether, and if so, when, Cetlinski received the *Miranda* warnings,[20] and that the Court of Appeals failed to base its decisions on the receipt of those warnings.[21]

The majority chooses to ignore that when Cetlinski was tried, the exclusion of evidence of a defendant's pretrial silence did not depend on whether the *Miranda* warnings had been given.[22] There was thus no reason for Cetlinski or the prosecutor to have developed a factual record regarding the warnings.

Nor was there reason for the Court of Appeals to predicate its decisions on the receipt of *Miranda* warnings. The Court of Appeals initial decision was issued before this Court limited the scope of

[19] See *ante,* p 746 ("the critical events took place prearrest and pre-*Miranda* and thus there could be no due process claim that the state unfairly used defendant's silence or omission against him at trial in violation of the implicit assurance in *Miranda* that silence will not be penalized").

[20] See *ante,* p 760, n 30 ("[the dissent's] discussion of *Doyle, supra,* is curious, given the fact that this defendant has never asserted, nor does the record support such a finding, that the prosecutor cross-examined the defendant about his failure to tell the police about the conversation with his employee after he was given *Miranda* warnings").

[21] See *ante,* p 745, n 7.

[22] When this case was tried, the controlling law was the Court's decision in *Bobo,* which adopted a virtually absolute prohibition of the evidentiary use of a defendant's pretrial silence and which was based on a different rationale than the one later developed by the United States Supreme Court in *Doyle v Ohio.*

*Bobo* in *People v Collier.* On remand, the Court of
Appeals concluded that the limitation of *Bobo*
adopted in *Collier* was not applicable.[23] The Court
of Appeals determined on remand that the instant
case was controlled by *Bobo,* not by *Collier.* There
was still no reason for the Court of Appeals to
base its decision on the receipt of *Miranda* warn-
ings.[24]

A claim of *Doyle* error *may* properly be rejected

[23] In *Collier,* p 31, the Court said that "the *Bobo* holding only
applied to those situations where the state seeks to impeach a
defendant with his silence maintained during contact with police
officers." The Court also said, however, that *Bobo* is "confined to
impeachment for and comment on silence at the time of arrest in the
face of accusation." *Id.,* p 39.

When a defendant's silence occurs during a prearrest police contact,
the two formulations may yield different results with respect to the
applicability of *Bobo.* This divergence is reflected in recent decisions
of the Court of Appeals. Compare *People v Sligh,* unpublished opinion
per curiam of the Court of Appeals, decided October 14, 1987 (Docket
No. 93016) (Supreme Court Docket No. 81963, now being held in
abeyance) (*Bobo* still applies to silence during a prearrest police
contact), with *People v Smith,* 158 Mich App 220; 405 NW2d 156
(1987) (*Bobo* does not apply to silence during a prearrest police
contact), and *People v Nimmons,* unpublished opinion per curiam of
the Court of Appeals, decided November 5, 1987 (Docket No. 98982)
(Supreme Court Docket No. 82285, now being held in abeyance).

In the instant case, the Court of Appeals interpreted *Collier* as
limiting *Bobo* to situations where the defendant's silence occurs
during contact with police officers. See *People v Cetlinski (On Re-
mand),* n 8 *supra.* The Court of Appeals reading of *Collier* is reason-
able. Statements in judicial opinions are customarily construed with
reference to the facts of the case in which the statements were made.
See *Collier,* p 31 (in discussing the statement in *Bobo,* p 360, that "the
defendant's Fifth Amendment right to remain silent is constant," the
Court explained that "[t]hat statement must be interpreted in light of
the facts and in the context of *Bobo*"). In *Collier,* the defendant's
silence did not occur during prearrest police contacts; it occurred
before any police contact whatsoever. *Id.,* pp 31-32.

The majority asserts that "we clearly had stated in *Collier, supra,* p
39, that *Bobo* 'is confined to impeachment for and comment on silence
at the time of arrest in the face of accusation.' " *Ante,* p 759, n 28.
See also *ante,* p 757. That holding was "clear" only if one ignores the
facts of *Collier* and the other statements in the Court's opinion,
including the Court's statement that "the holding of this case [i.e.,
*Collier*] is limited to only those situations where the 'silence' that is
questioned occurs before any contact with the police." *Collier,* p 32, n
2.

[24] See n 22.

on the basis of the inadequacy of the record.[25] Alternatively, an appellate court *may* properly remand[26] to provide the defendant an opportunity to develop a factual record that would substantiate a *Doyle* claim.[27]

A defendant should not be denied an opportunity to develop an evidentiary record that would substantiate a claim of *Doyle* error on the basis of a "failure" to develop such a record where the trial occurred before this Court's declaration in the instant case that Michigan law is coextensive with the minimal requirements of the Due Process Clause of the Fourteenth Amendment. Neither the prosecutor nor the defendant can properly be held accountable for a failure to develop an evidentiary record in conformity with subsequent developments in Michigan law.

Since the Court chooses to hold litigants strictly liable for their lack of prescience, the Court should at least be consistent. It is remarkable that the

[25] In *Fletcher v Weir,* n 17 *supra,* the United States Supreme Court indicated that a record, that does not establish that the defendant received *Miranda* warnings during the postarrest period in which he remained silent, is not a sufficient basis on which to find *Doyle* error.

[26] Nothing in the opinion in *Weir,* n 17 *supra,* suggests that remand is improper, and the subsequent history of that case indicates that an evidentiary hearing was eventually held. See *Weir v Wilson,* 744 F2d 532 (CA 6, 1984).

When exercising direct review, several federal courts have indicated that remand is appropriate. See *United States v Massey,* 687 F2d 1348, 1353 (CA 10, 1982), and *United States v Cummiskey,* 728 F2d 200 (CA 3, 1984). See also *United States v Pino,* 827 F2d 1429, 1432 (CA 10, 1987).

[27] The record indicates that Cetlinski spoke with Trooper Dennis Bowman (during the fire), Fire Chief James VanDoren (immediately after the fire was contained), Detective-Sergeant John Fatchett (the day after the fire), Detective-Sergeant Jack Messer (the officer who signed the criminal complaint), and Detective-Lieutenant Thomas Majeske.

Although the prosecutor's initial question was apparently directed to Cetlinski's conversation with Trooper Bowman (see n 4), his later questions referred to all of Cetlinski's discussions with police and fire personnel (see n 5). Cetlinski may have received the *Miranda* warnings during one or more of these conversations.

Court is willing—although unnecessary for deci-
sion, we all agree—to march up the mountain,
consider, and then march down the mountain to
reject on the merits a claim of *Doyle* error, but is
unwilling to continue its trek and address the
evidentiary admissibility of the challenged testi-
mony "because the record was developed pre-
*Collier* and thus failed to address factors later
made critical under the evidentiary analysis enun-
ciated in *Collier.*"[28] The concerns so expressed by
the majority are equally applicable to the inade-
quacy of the record regarding the receipt of *Mi-
randa* warnings.

To be sure, the record as it now stands tends to
support the contention that the cross-examination
was not *Doyle* error.[29] But the record as it now
stands similarly tends to support the contention
that the challenged testimony was inadmissible
under an evidentiary analysis.[30]

C

Because the Court has decided to treat the in-
stant case as not involving post-*Miranda* "silence,"
we agree that the Court is not called on to decide
the applicability of *Doyle* to the "partially silent"
defendant.

IV

The impeachment use of a defendant's pretrial
silence raises important issues under conventional

---

[28] *Ante,* p 761.

[29] There is a superficial plausibility in the majority's assumption
that the cross-examination of Cetlinski was limited to the pre-
*Miranda* time frame. There was no testimony regarding custodial
interrogation, and it appears that most of Cetlinski's conversations
with law enforcement personnel occurred before he was arrested.

[30] See part IV(C).

evidence law. Evidence of a defendant's silence is
*not* automatically admissible because the United
States Constitution does not bar its introduction.

## A

The majority recognizes that an evidentiary
analysis applies when it is sought to use a defen-
dant's silence for impeachment.[31] Indeed, this
Court remanded this very case for reconsideration
in light of *Collier.*[32] The majority avoids addressing
the merits of the evidentiary question in the in-
stant case on the basis that any error does not
require reversal of Cetlinski's conviction.[33]

The majority says, and we agree, that "the
record is insufficient to permit us to determine
whether there was evidentiary error because the
record was developed pre-*Collier* and thus failed to
address factors later made critical under the evi-
dentiary analysis enunciated in *Collier.*"[34]

Ordinarily, we would not fault the majority's
reticence. A definitive pronouncement on the evi-
dentiary question is, we all agree, unnecessary for
decision in the instant case. However, in light of
the majority's decision to utilize this case as a
platform for the issuance of "definitive" pro-
nouncements on other aspects of substantive law,
the majority might more properly go on to say
whether the challenged testimony was admissible

---

[31] See, for example, *ante,* p 759 ("Consistent with our rationale in
*Collier,* we conclude that an evidentiary approach to the use of a
defendant's prearrest, pre-*Miranda* statements, including omissions,
will adequately protect the policy interest in foreclosing the factfinder
from unfair inferences of guilt"). See also *ante,* pp 746-747 and 759.

[32] See n 7.

[33] See *ante,* p 761.

The majority's invocation of "harmless error" is somewhat incon-
gruous given its decision to abandon similar considerations of judicial
restraint with respect to the other substantive issues in this case.

[34] *Ante,* p 761. See also *ante,* p 762, n 34.

under an evidentiary analysis, a question that must be answered whenever the prosecutor seeks to elicit a defendant's pretrial silence.

The majority asserts that it is further limiting, actually eliminating, *Bobo* to rectify confusion and uncertainty.[35] In the process, it has put in question, if not eliminated, much of the Michigan case law concerning the admissibility of silence. Instead of clarity and certainty, the majority leaves a vacuum in the wake of today's decision.

B

To be admissible, evidence must be "relevant" in that it "makes 'the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' "[36] There are accordingly two components of "relevance," and if either is not present, the evidence is not admissible. The evidence must be probative,[37] and it must be material.[38]

Although there are a number of means by which a witness' testimony may be impeached, the impeachment use of "silence" is customarily justified on the basis that the "silence" amounts to a prior inconsistent statement. Where this is the theory of impeachment, evidence of a defendant's "silence" —standing alone or in conjunction with other evidence—is not admissible unless it tends to prove that the defendant by his silence made a

[35] See *ante,* pp 745, 755, and 757-758.

[36] *Ante,* p 747 (quoting MRE 401).

[37] In the language of MRE 401, the evidence must tend "to make the existence of any fact . . . more probable or less probable than it would be without the evidence."

[38] In the language of MRE 401, the fact which the evidence tends to prove or disprove must be "of consequence to the determination of the action."

"statement." Once it has been determined that the silence tends to prove the defendant made a "statement," it is necessary to determine whether the defendant's "statement" is material in that it is sufficiently inconsistent with his trial testimony to shed light on the credibility of that testimony.

It is the probativeness prong that raises the most troublesome questions when a defendant's "silence" is used for impeachment purposes. A defendant's "silence" does not necessarily mean anything. There will often be a large number of possible explanations for a defendant's failure to provide information.

To be admissible as a prior inconsistent statement, it must be possible to conclude with some degree of certainty that a likely explanation for the defendant's "silence"—among the many available explanations—is that the defendant did not assert a particular fact to which he testified at trial because that fact did not exist.

Stated differently, if there is no reason to expect a person to have asserted a fact if the fact did exist and no reason to expect a person to have asserted the fact if the fact did not exist, evidence of the person's failure to assert the fact does not tend to prove the fact did not exist.

In *Collier,* this Court held that the impeachment use of a defendant's "prearrest silence" does not violate the Self-Incrimination Clause of the Michigan Constitution, Const 1963, art 1, § 17.[39] The

[39] See *Collier, supra,* pp 36-39.

The Court rejected Collier's contention that the impeachment use of his prearrest silence violated the Due Process Clause of the Michigan Constitution (Const 1963, art 1, § 17) because the evidence lacked probative value. The Court concluded that the challenged evidence was probative. See *Collier,* p 37.

When this Court decided *Collier,* the United States Supreme Court had already held that the impeachment use of a defendant's prearrest silence does not violate the United States Constitution. See *Jenkins v Anderson,* n 17 *supra.*

Court limited *Bobo* to "those situations where the state seeks to impeach a defendant with his silence maintained during contact with police officers."[40] The Court did not stop there. Rather, it discussed and developed an analytical framework for determining the admissibility of prearrest silence.

*Collier* involved the impeachment use of a defendant's prearrest failure to come forward and inform the police that he had been the victim of an armed robbery.[41] The Court held that Collier's failure to report the crime was admissible to impeach his trial testimony because, under the circumstances related by him, it would have been natural to report the crime.[42] Since it would have been natural for Collier to have come forward, his failure to do so had probative value to impeach his testimony that he was the victim of a crime.

In *Collier*, the defendant's testimony was impeached with his failure to seek out the police and inform them that he had been the victim of a crime. Cetlinski's testimony was impeached with his failure to volunteer information that would have tended to incriminate him with respect to the crime being investigated. The only apparent differ-

---

[40] *Collier*, p 31.

The alternative formulation is that the Court limited *Bobo* to "impeachment for and comment on silence at the time of arrest in the face of accusation." *Collier*, p 39. See also n 23.

[41] Collier was charged with assault with intent to commit murder. He testified at trial that he was the victim of an armed robbery and that he had stabbed one of his "assailants" in self-defense.

[42] The Court explained:

> [W]e believe it is entirely natural and expected that one who has been robbed under the circumstances related by the defendant would report the crime to the police. Defendant knew the identity of the robber and the location of the robbery. It would have been natural for him to report the crime to the police, to have the assailant arrested, and to retrieve his property. [*Id.*, pp 34-35.]

ence between *Collier* and the instant case is that Cetlinski appears to have made some statements to law enforcement personnel, whereas Collier made no statements (i.e., he failed to come forward).

Another analytical framework was applied in *People v Cole,* 411 Mich 483; 307 NW2d 687 (1981). Cole was charged with assault with intent to commit murder. She told the police that when she shot the victim, she believed he was attempting to arm himself with a metal dog stake. On direct examination, however, Cole testified that she thought the victim was attempting to arm himself with a gun. The prosecutor cross-examined Cole with respect to her prior inconsistent statement.

This Court held that "the cross-examination of the defendant with regard to her prior inconsistent statement was permissible."[43] The Court distinguished *Bobo* on the ground that Cole "had made a statement which *conflicted* with her testimony at trial."[44] The Court also quoted from *Anderson v Charles,* 447 US 404; 100 S Ct 2180; 65 L Ed 2d 222 (1980), where the United States Supreme Court—holding that the impeachment use of a defendant's prior inconsistent statement does not violate the rule stated in *Doyle*—said that " '[a]s to the subject matter of his statements, the defendant has not remained silent at all.' "[45]

In *Cole,* the defendant's testimony was impeached with a prior statement that was actually inconsistent with her trial testimony. Cetlinski's testimony was not impeached with a prior statement that was actually inconsistent with his trial testimony. His testimony was impeached with his

---

[43] *Id.,* p 488.

[44] *Id.,* p 487 (emphasis added).

[45] *Cole,* p 488 (quoting *Charles, supra,* p 408).

*failure* to make a statement about the conversation with Rodriquez.

Although Cetlinski did not make a statement that was actually inconsistent with his trial testimony, that does not render *Cole* inapplicable. Similarly, although Cetlinski made statements to law enforcement personnel, that does not render *Collier* inapplicable. Rather, *Cole* and *Collier* occupy two ends of a continuum. Whether a given case is more like *Cole* or more like *Collier* will depend on the facts of the case.

The majority says that "omissions from an affirmative voluntary response to questions about the same subject matter testified to at trial do not constitute 'silence.' "[46] We agree that whether the defendant made prior statements concerning "the same subject matter" as his testimony may be an important factor in determining the admissibility of the defendant's failure to mention the facts to which he testifies at trial. The difficulty lies in determining whether a pretrial "statement" concerns "the same subject matter" as subsequent trial testimony.[47]

The majority also says that "the failure to assert a material fact when formerly narrating on the matter now dealt with amounts to an assertion, or statement, of the nonexistence of the fact."[48] Although some of the authority cited by the majority does not appear to support the proposition for

[46] *Ante,* p 748.

It is unimportant whether a defendant's failure to volunteer information during a pretrial statement is described as an "omission" or as "silence." Admissibility is a function of relevance, not labels.

[47] The cases cited by the majority (see *ante,* p 748, n 12) are not very helpful. Both *Charles* and *Cole* involved impeachment with prior statements that were actually inconsistent with the defendant's trial testimony. Those cases offer little guidance where the defendant's pretrial statements and testimony are inconsistent only by implication.

[48] *Ante,* p 748.

which it is cited,[49] we agree that whether the
defendant has formerly narrated on the same
subject as his trial testimony may be an important
factor in determining the admissibility of his fail-
ure to mention a fact to which he testifies at trial.
The difficulty, again, lies in determining whether a
pretrial "statement" amounts to a "narration."

There are no bright-line rules for determining
the admissibility of a defendant's failure to volun-
teer information during a pretrial statement. The
primary consideration is whether there is a basis
on which it can be said with a reasonable degree
of certainty that the defendant's failure to volun-
teer information is probative with respect to some
fact that tends to impeach his trial testimony. The
defendant's "silence" must have an assertive qual-
ity.

Two attributes of a defendant's pretrial state-
ments may be germane to this inquiry: the "quan-
tity" of the statements, and their "quality." The
more a defendant said about a given subject—the
more his statements purported to be a complete
description of a given event—the greater is the
likelihood that the defendant's failure to volunteer
particular information is probative. Likewise, the

_____

[49] The majority cites 3 Weinstein, Evidence, ¶ 607[06], pp 607-97 to
607-98. See *ante,* p 748, n 11. The cited passage reads:

   Another perplexing point is whether a failure to assert a fact
   it would have been natural to affirm amounts to an assertion of
   the nonexistence of the fact which can be used to impeach
   testimony in which the witness admitted the fact's existence.
   According to Wigmore such a failure to make an assertion
   should be admitted as a prior inconsistent statement, and the
   federal cases are in accord. [Citations omitted.]

The cited passage is a mirror image of this Court's analysis in
*Collier.* See ns 39-42 and the accompanying text. The failure to assert
a fact is treated as an assertion of the nonexistence of the fact
because it would have been natural to assert the fact, not as the
majority suggests because the witness has formerly narrated on the
same subject as his trial testimony.

more narrowly a defendant confines the subject matter of his statements, the greater is the likelihood that his failure to mention a fact related to that narrow subject matter is probative.

C

If evidentiary error would require reversal of Cetlinski's conviction, it would indeed be appropriate to remand "because the record was developed pre-*Collier* and thus failed to address factors later made critical under the evidentiary analysis enunciated in *Collier*."[50] "For the benefit of the bench and bar," we consider, in light of the demise of *Bobo,* the admissibility of Cetlinski's failure during discussions with police and fire officials to mention his conversation with Rodriquez.

On the present record, we would hold that Cetlinski's failure to mention the conversation did not have probative value because it would not have been natural for Cetlinski to have volunteered the information.[51] We would hold, in agreement with the Court of Appeals, that the prosecutor's cross-examination was improper.[52]

The present record contains nothing more than general testimony that Cetlinski engaged in conversations with police and fire investigators. There is little specific evidence about Cetlinski's statements during those discussions. There is no evidence that Cetlinski was asked a question, or volunteered information, regarding any conversation with Rodriquez. Nor is there any evidence

---

[50] *Ante,* p 761.

[51] We thus disagree with the trial court to the extent its decision to allow the cross-examination was based on an assessment of the probative value of Cetlinski's "silence."

[52] For the reasons discussed in part II, the error does not require reversal.

that Cetlinski was asked a question that would call on him to mention the disputed conversation.

On this record, the probative value of Cetlinski's failure to mention the conversation with Rodriquez is not enhanced ·by his pretrial statements. This case presents a situation like that in *Collier* where the defendant's failure to come forward with information—not prior "statements, including omissions"—was the basis for the prosecutor's impeachment.

Cetlinski first spoke with law enforcement personnel while his bar was still ablaze. During this questioning, Trooper Bowman asked Cetlinski whether he had insurance on the bar and whether he was behind on his taxes or other payments. Under the circumstances, it would not have been natural for Cetlinski to spontaneously assert that "five or six months ago I asked someone to look into hiring an arsonist to burn my bar, but I was only joking."[53]

Cetlinski's "exculpatory" version of the conversation with Rodriquez was highly incriminatory. An innocent person is no more likely to volunteer self-incriminating information than a guilty person. Cetlinski's failure to mention the conversation had little or no probative value with respect to whether the conversation actually occurred as described in his testimony.[54]

---

[53] The majority notes that the prosecutor's cross-examination inquired into Cetlinski's failure during the entire course of the investigation—not only during the initial discussion with Trooper Bowman—to mention the conversation with Rodriguez. See *ante,* p 762, n 34. In light of the initial conversation and in the absence of any record evidence suggesting that the import of that conversation (i.e., that Cetlinski was a "suspect") was erased by subsequent developments, we do not believe it would have been natural for Cetlinski to have mentioned the conversation at any time during the investigation.

[54] See *Commonwealth v Nickerson,* 386 Mass 54, 60-61; 434 NE2d 992 (1982) (discussed and cited with approval in *Collier, supra,* pp 32-34), where the Supreme Judicial Court of Massachusetts concluded:

On this record, to suggest otherwise would be tantamount to holding that all persons—innocent and guilty—have a duty to volunteer self-incriminating information. Such a holding would be contrary to the decisions of this Court. Long ago, the Court concluded that a person was not under a moral or legal obligation to deny an incriminatory accusation made by an ordinary citizen.[55] Likewise, a person does not have an affirmative duty to volunteer self-incriminating information to a police officer.

## V

The majority in effect overrules *People v Bobo* by holding that this Court's decision in that case is

It would not have been "natural" for the defendant to have come forward in the circumstances of this case and produce incriminating evidence against himself. While the use of this defendant's pre-arrest silence would apparently not violate due process principles of the Fourteenth Amendment . . ., his failure to come forward in these circumstances says little about the truth of his trial testimony.

See also *State v Merola,* 214 NJ Super 108, 117-118; 518 A2d 518 (1986), and *Silvernail v State,* 777 P2d 1169, 1178 (Alas App, 1989).

[55] See *People v Bigge,* 288 Mich 417, 420; 285 NW 5 (1939), where the Court said:

The time has not yet come when an accused must cock his ear to hear every damaging allegation against him and, if not denied by him, have the statement and his silence accepted as evidence of guilt. There can be no such thing as confession of guilt by silence in or out of court. The unanswered allegation by another of the guilt of a defendant is no confession of guilt on the part of a defendant. Defendant, if he heard the statement, was not morally or legally called upon to make denial or suffer his failure to do so to stand as evidence of his guilt.

*Bigge* involved the substantive use of a defendant's failure to deny an incriminatory accusation made in his presence. We agree with the majority that the Court's decision in that case does not control this case. See *ante,* p 763, n 35. Unlike the majority, however, we would not rely on Justice POTTER's separate opinion—not joined by any other justice—to characterize the Court's decision in *Bigge.*

henceforth to be construed coextensively with the
minimal requirements of the United States Consti-
tution.

A

The decision in *Bobo* was based on constitu-
tional, evidentiary, *and* natural law concerns.

With respect to the federal constitutional privi-
lege against self-incrimination, the Court said that
"whenever a person is stopped for interrogation by
the police, whether technically under arrest or
not, the Fifth Amendment guarantees that his
silence may not be used against him."[56] We agree
that United States Supreme Court decisions since
*Bobo* establish that this was an overly broad state-
ment, or prediction, of the extent to which the
United States Constitution protects a defendant
from the evidentiary use of his pretrial silence.[57]

*Bobo* also relied, however, on this Court's pre-
*Miranda* decision in *People v Bigge,* 288 Mich 417;

[56] *Bobo,* p 361.

The Court also said that "[w]hether [Bobo's] silence was prior to or
at the time of arrest makes little difference—the defendant's Fifth
Amendment right to remain silent is constant." *Id.,* p 360.

[57] Contrary to the statements in *Bobo,* the Fifth Amendment is not
implicated when a defendant's trial testimony is impeached with his
pretrial silence. See *Jenkins v Anderson,* n 17 *supra.* Rather, it is the
"fundamental fairness" component of the Due Process Clause that
governs such impeachment.

When a defendant's silence occurs before the receipt of *Miranda*
warnings, the Due Process Clause does not bar impeachment with the
defendant's silence. *Jenkins; Fletcher v Weir,* n 17 *supra.* When a
defendant remains silent after the receipt of *Miranda* warnings, the
Due Process Clause generally does bar impeachment with such si-
lence. *Doyle v Ohio, supra.*

The United States Supreme Court has thus drawn the line of
demarcation at the giving of *Miranda* warnings. Contrary to the
broad statement in *Bobo,* it is not constitutionally dispositive that the
defendant's silence occurred during interrogation by the police.

The United States Supreme Court has not spoken respecting the
substantive use of a defendant's pre-*Miranda* silence. *Bobo's* reliance
on the Fifth Amendment may to that extent ultimately prove to be
correct.

285 NW 5 (1939). There, the Court found error requiring reversal in the prosecutor's reference to Bigge's failure to deny an incriminatory accusation made in his presence.[58] The Court ruled that evidence of an incriminatory accusation made in a defendant's presence and his failure to deny the accusation is not admissible as substantive evidence of guilt.[59]

*Bobo* also was predicated on evidentiary principles. The Court in effect said that evidence of a defendant's pretrial silence is not admissible as a prior inconsistent statement or as the admission of a party-opponent.[60] The Court thus appears to have concluded that silence is not an assertion that the events did not occur in the manner in which the defendant later testified.[61]

The Court also drew upon nonlegal, yet authoritative, texts. The Court observed that the rule against the evidentiary use of a defendant's silence " 'has higher sanction than mere judicial precedent,' " and illustrated by quoting from the New Testament.[62]

---

[58] In his opening statement, the prosecutor said:

"[T]his person, his brother-in-law in fact, said to this witness who will testify, 'What's the use of going over this matter again. Charles [the defendant] is guilty as hell.' "

After an objection, the prosecutor continued:

"I haven't finished. Charles Bigge could have said right there if it wasn't true. It was his duty to have said so." [*Id.*, p 419.]

[59] See *id.*, p 420 (quoted in n 55).

[60] *Bobo*, p 359 (" 'Nonutterances' are not statements").

[61] A defendant's pretrial silence could be used, however, to contradict his testimony about pretrial events. *People v Graham*, 386 Mich 452; 192 NW2d 255 (1971) (cited in *Bobo*, p 359).

In *Graham*, the Court held that rebuttal testimony regarding the defendant's silence was proper because "[Graham's] refusal to speak is inconsistent with his testimony at trial that he was constantly attempting to explain to the police what had occurred." *Id.*, p 458.

[62] *Bobo*, p 362 (quoting *State v Hogan*, 252 SW 387, 388 [Mo, 1923]).

The rule stated in *Bobo* thus had a number of doctrinal sources. One of those sources was indeed the Fifth Amendment privilege against self-incrimination. In light of the post-*Bobo* decisions of the United States Supreme Court, it is clear that the Fifth Amendment rationale no longer supports the rule stated in *Bobo*.[63]

The majority overrules *Bobo* in response to these developments in Fifth Amendment jurisprudence. Overruling *Bobo* is not, however, the correct response.

The invalidation of one of the several rationales for the decision in *Bobo* does not justify the elimination without further explanation of the rule there stated. The majority does not explain why the other bases of the *Bobo* decision were incorrect or insufficient to support the rule stated in *Bobo*.[64]

**B**

The majority's decision implicates a wide array of issues not presently before the Court.

The instant cases do *not* involve:

—the *substantive* use of a defendant's failure to come forward and provide information to the police;[65]

---

The Court quoted two excerpts from the Book of Matthew recounting the Trial of Jesus. See Matthew 26:57-68 (during His trial before the Sanhedrin, Jesus remained silent in the face of false accusations); Matthew 27:11-25 (before Pontius Pilate, Jesus again remained silent in the face of accusation).

See, generally, Rosenberg & Rosenberg, *In the beginning: The Talmudic rule against self-incrimination,* 63 NYU L R 955 (1988).

[63] But see n 57 (last paragraph).

[64] The majority largely ignores those other bases for decision (see *ante,* pp 755-756), thereby conveying the incorrect impression that *Bobo* was predicated solely on the United States Constitution.

[65] The companion *Sutton* case concerns the *impeachment* use of a defendant's failure to come forward.

The Court of Appeals found error requiring reversal in the *substan-*

—*the substantive or impeachment* use of a defendant's total silence, or failure to answer particular questions, during prearrest investigative contacts with the police;[66]

—the *substantive* use of a defendant's failure to make particular assertions during prearrest investigative contacts with the police;[67]

—the *substantive or impeachment* use of a defendant's total silence, failure to answer particular questions, or failure to make particular assertions, *after* the defendant has been arrested *but before* he has received the *Miranda* warnings;

—*the substantive or impeachment* use of a defendant's postarrest, post-*Miranda* failure to make particular assertions;[68] and

—the *impeachment* use of a defendant's postarrest, post-*Miranda* failure to answer particular questions.[69]

By failing expressly to reserve these issues, the majority's opinion could be read as obiter dictum on a scale not seen since *Bobo*.[70] Issues not truly before the Court are better left unanswered until they are presented in the context of actual cases.

*tive* use of a defendant's failure to come forward in *People v Patterson*, 170 Mich App 162; 427 NW2d 601 (1988) (Supreme Court Docket No. 84341, now being held in abeyance).

[66] In *People v Sligh* (Supreme Court Docket No. 81963, now being held in abeyance), the Court of Appeals found error requiring reversal in the rebuttal use of a defendant's total silence during investigative contacts with the police.

[67] The instant case involves the *impeachment* use of a defendant's failure to make particular assertions during such contacts.

[68] In *People v Talley* (Supreme Court Docket No. 84360), the Court of Appeals found no error in the impeachment use of a defendant's failure to assert an exculpatory version during a postarrest, post-*Miranda* interview.

[69] The companion *McReavy* case involves the *substantive* use of a defendant's postarrest, post-*Miranda* failure to answer particular questions.

[70] Cf. *ante*, p 755 (referring to the "facts, holding, and dicta of *Bobo*").

Many of those issues are presented in cases now being held in abeyance.[71]

C

By in effect overruling *Bobo,* the majority effectively eliminates much of the case law regarding the admissibility of a defendant's silence. Although the majority says that an evidentiary analysis must be applied when determining the admissibility of a defendant's pretrial silence,[72] the majority nonetheless chooses not to apply an evidentiary analysis in *this* case.

Nevertheless, trial judges and the Court of Appeals are obliged to carefully examine the evidentiary admissibility of a defendant's pretrial silence because whether or not the United States Constitution is implicated, a defendant's silence is *not* generally admissible.

To suggest otherwise would be a significant step toward a transformation of the criminal justice system. It is fundamental that our legal system is adversarial, not inquisitorial. In a criminal prosecution, the state must prove its case and overcome the presumption of innocence without involuntary assistance from the defendant.

When a person is questioned during a police investigation, he has the choice of volunteering information and answering questions, or of remaining silent. If he chooses to "coöperate," his statement can be used against him at trial as substantive evidence of guilt or for impeachment purposes. Given the potentially adverse consequences of making a statement, it is understand-

---

[71] See ns 65-69 and the accompanying text.

[72] This aspect of the majority's decision is discussed more fully in part IV(A).

able that many persons, innocent and guilty, choose to remain silent.

If a defendant's silence during police questioning were routinely admitted without adequate inquiry, a person under investigation would have become unable to avoid providing grist for the prosecutor's mill. What he says could be used against him *and what he does not say could be used against him.*[73] The majority presumably does not take such a drastic step toward transforming the criminal justice system from adversarial to inquisitorial.[74]

**D**

Notwithstanding the intervening developments in Fifth Amendment jurisprudence,[75] we would adhere to the rule stated in *Bobo.* To dispel any future confusion as to its doctrinal source,[76]

---

[73] Although the United States Supreme Court has not addressed the question whether the constitution prohibits the *substantive* use of a defendant's pre-*Miranda* silence, under certain circumstances such use of a defendant's silence may be unconstitutional. Thus, there may still be situations in which a defendant's silence could only be used for impeachment purposes.

In such situations, an accused, who "chose" to give evidence in the form of pre-*Miranda* silence instead of a pre-*Miranda* statement, could "take back" the evidence by not testifying at trial. It is not unconstitutional for the state to require an individual to waive his right to testify as the price for not using against him at trial evidence that he could not avoid giving in the first place. See *Jenkins v Anderson,* n 17 *supra.* It does, however, seem contrary to fundamental principles of fairness in an adversarial system that the only way an accused can avoid giving evidence against himself is by remaining silent both before and during trial.

[74] The tension between an adversarial system of justice and the evidentiary use of an accused's silence has been recognized. See *People v Edelbacher,* 47 Cal 3d 983, 1041; 254 Cal Rptr 586; 766 P2d 1 (1989) (Mosk, J., concurring) (quoting *People v Free,* 131 Cal App 3d 155, 166; 182 Cal Rptr 259 [1982]), and *State v Jones,* 461 So 2d 97, 101 (Fla, 1984) (Boyd, C.J., dissenting). See also *People v Wade,* 93 Mich App 735, 738; 287 NW2d 368 (1979).

[75] See n 57.

[76] Although the majority may be correct in asserting that there is some uncertainty concerning *Bobo*'s doctrinal source (see *ante,* pp 745, 755, and 757–758), the majority's solution does not eliminate uncertainty from this area of the law. The validity under the United States Constitution of the substantive use of a defendant's pre-*Miranda* silence, and of the substantive and impeachment use of a defendant's post-*Miranda* "partial silence," is uncertain at present. In effect, the majority replaces the uncertainty concerning *Bobo*'s doctrinal source with uncertainty concerning how the now-"clarified" law is to be applied.

we would hold that henceforth, as adumbrated in *Collier*, *Bobo* should be understood as a rule of evidence that reflects a general assessment concerning the probative value and prejudicial effect of reference to a defendant's pretrial silence.[77]

This was the approach of the New York Court of Appeals, which relied on evidentiary principles alone[78] to support a general prohibition of the use of a defendant's pretrial silence, concluding:

> Because evidence of a defendant's pretrial silence may have a disproportionate impact upon the minds of the jurors and because the potential for prejudice inherent in such evidence outweighs its marginal probative worth, we conclude that the use of such evidence for impeachment purposes cannot be justified in the absence of unusual circumstances . . . . [*People v Conyers*, 52 NY2d 454, 459; 438 NYS2d 741; 420 NE2d 933 (1981) (*Conyers II*).][79]

CAVANAGH and ARCHER, JJ., concurred with LEVIN, J.

---

[77] This reading finds support in the language of this Court's opinion (see ns 60-61 and the accompanying text), and some Court of Appeals opinions. See *People v Staley*, 127 Mich App 38, 41-42; 338 NW2d 414 (1983), and *People v Karam*, 106 Mich App 383, 391, n 3; 308 NW2d 220 (1981).

Even if the sole rationale for *Bobo* were the Fifth Amendment, we note that other courts that have held that evidence of a defendant's silence is generally inadmissible have done so moving from a constitutional rationale to an evidentiary one, and vice versa. Compare *People v Conyers*, 49 NY2d 174; 424 NYS2d 402; 400 NE2d 342 (1980) (constitutional grounds), vacated and remanded in light of *Jenkins v Anderson*, n 17 *supra*, with *People v Conyers*, 52 NY2d 454; 438 NYS2d 741; 420 NE2d 933 (1981) (evidentiary grounds). Compare, also, *United States v Hale*, 422 US 171; 95 S Ct 2133; 45 L Ed 2d 99 (1975) (evidentiary grounds) with *Doyle v Ohio, supra* (constitutional grounds).

[78] Cf. *Collier, supra*, p 38, expressing this Court's reluctance to be the first court to construe a state constitution more expansively than the federal constitution with respect to the evidentiary use of a defendant's prearrest silence.

[79] Although *Conyers II* involved postarrest, pre-*Miranda* silence, the court's opinion refers generally to "pretrial silence." The New York Court of Appeals recently "extended" *Conyers II* to prearrest silence. See *People v De George*, 73 NY2d 614; 543 NYS2d 11; 541 NE2d 11 (1989).