*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DERRYL WADE SHELTON,

Defendant-Appellant.

UNPUBLISHED
August 20, 2020

No. 337796
Washtenaw Circuit Court
LC No. 15-000590-FC

ON REMAND

Before: GLEICHER, P.J., and SERVITTO and LETICA, JJ.

PER CURIAM.

This case is before us on remand from the Supreme Court "to consider whether the prosecutor's references to the defendant's prearrest silence were relevant and admissible under MRE 401 and MRE 403 . . . and if not, whether it is more probable than not that the error was outcome determinative[.]" *People v Shelton*, ___ Mich ___ (Docket No. 159883, July 1, 2020). After reviewing the cases specified by the Supreme Court and considering the record in its entirety, we conclude that the testimony was irrelevant and therefore inadmissible. Moreover, the improperly admitted evidence was extremely prejudicial and there is a probability that its admission was outcome determinative. We vacate defendant's convictions and sentences and remand to the trial court for a new trial at the prosecutor's discretion.

## I. BACKGROUND

A jury convicted defendant of one count each of first and second-degree criminal sexual conduct against a 15-year-old girl living in his home. In *People v Shelton*, unpublished per curiam opinion of the Court of Appeals, issued November 27, 2018 (Docket No. 3377960) (*Shelton I*), unpub op at 1, we laid out the factual background of this case, in relevant part, as follows:

> Defendant and his wife, Shantay Shelton, brought 15-year-old PW into their home in January 2015. PW had been removed from her mother's care as a toddler; her father was unable to care for her because he was disabled and lived in a nursing home. PW and her younger sister moved in with their older sister, Dana, who was

53-years-old at the time of the trial. Dana terminated her guardianship over PW in 2014 due to disciplinary issues.

Virgil and Velicia Humes became PW's guardians. Virgil Humes was the pastor at the church PW attended. PW moved out of the Humeses' home when they confronted her about behavior problems. The Sheltons attended the Humeses' church and agreed to take over as PW's guardians. Defendant had been a Detroit police officer for 22 years[1] and Shantay owned a hair salon.

PW alleged that defendant sexually abused her on three occasions in 2015. PW wrote about one incident in her diary and she twice reported the abuse to a friend at church. After the second report, the friend asked her mother to speak to PW, and the mother encouraged PW to report the abuse to Shantay. *Id*. at 1-2.

Shantay responded by taking PW to the Humeses' home, a "safety plan" the Sheltons had in place given PW's troubled past. Shantay admitted that she did not believe PW's accusations. Velicia Humes contacted a friend who had worked for Child Protective Services. This individual advised Velicia to take PW to the hospital in the morning.

Velicia took PW to the hospital on April 9, 2015. The emergency room doctor who attended to PW did not conduct a sexual assault examination as the alleged assaults had occurred more than 72 hours earlier. But the hospital did contact the police.

Several weeks later, the prosecutor filed a felony complaint charging defendant with the two crimes of conviction and obtained an arrest warrant. Defendant voluntarily appeared in district court, with counsel, and a bond was set. Defendant posted bail and was not taken into custody. Subsequently defendant was arraigned on the felony information in circuit court; a transcript of the arraignment has not been provided to us. Defendant was never formally arrested and was not placed in custody until after his conviction. He was represented by retained counsel from the outset of the prosecution. [*Id*. at 2.]

As noted, a jury convicted defendant of one count each of first and second-degree CSC. Defendant appealed as of right, raising multiple challenges. Relevant to this remand, defendant argued "that the prosecutor invaded his constitutional rights by repeatedly questioning him about his decision not to speak to the police during the investigation." *Id*. at 2. The extensive cross-examination on this point was quoted in *Shelton I*, unpub op at 2-6, as follows:

---

[1] Defendant explained in his appellate brief that he had retired from the Detroit Police Department before the events at issue. As defendant was no longer a law enforcement officer, he was not a mandatory reporter under MCL 722.623 and we need not consider the impact of that statute on defendant's Fifth Amendment rights.

*Q.* Now, you've been a Detroit Police Officer for how long?

*A.* 22 years.

*Q.* So you have probably investigated a lot of cases, correct?

*A.* No, I was a foot soldier. I didn't do any investigation.

*Q.* So you were a police officer rather than a detective, is that what you're saying?

*A.* Yes.

*Q.* Okay. So as soon as this allegation comes out, you didn't call the police, correct?

*A.* No.

*Q.* And did you think it might be important to call the police?

*[Defense Counsel].* Objection. Your Honor, for the same reason that I stated earlier on the record on side bar.[2]

*The Court.* Over-ruled.

*Q.* Did you think it might be important to call the police?

*A.* Well, I knew what course of events were going to occur.

---

[2] This sidebar was not transcribed into the record. However, this Court granted defendant's motion to expand the record to include an affidavit from trial attorney Ronnie Strong, but only after *Shelton I* was released. *People v Shelton*, unpublished order of the Court of Appeals, entered May 13, 2019 (Docket No. 337796). Strong attested:

> 5. The basis for my objections were two-fold: first, the prosecution's use of Mr. Shelton's pre and post arrest silence violated his Fifth and Fourteenth Amendment rights under the United States Constitution because his silence was based on my advice and predecessor counsel's advice that he had a right to remain silent and he should not make a statement.

> 6. The second ground for my objection was relevancy because Mr. Shelton's silence was not probative of his credibility or his guilt because it was strictly based on my advice and the advice of predecessor counsel that he should not and need not make a statement.

*Q*. So your decision, at that point, immediately was to contact the Humes and have a conversation with them, correct?

*A*. No, that was my wife's decision. I didn't know anything about that. She did that on her own.

*Q*. Okay. So . . . you didn't discuss anything with the Humes that night as soon as you learned of the disclosure?

*A*. Personally, I didn't, no. She had taken her off to [the Humeses'] house. I never got a chance to even ask her, what are you talking about. They took her off to Pastor's, and I knew that they were going to do what was necessary, so there was no need for me to do anything.

*Q*. But they didn't correct?

*A*. Yeah, they did.

*Q*. They contacted law enforcement?

*A*. Well, . . . they went to the hospital and . . . normal reaction for that with those kind of allegations, they call the police.

*Q*. The hospital calls the police?

*A*. Yes.

*Q*. But the Humes[es] never did? I mean, 24 hours passed.

*A*. I don't know what they did. I just know that procedure is you go to the hospital, they're gonna call the police.

*Q*. Well, usually when a law enforcement officer is aware of a crime or an allegation of a crime, or as you're saying, a false report of a crime, you would call the police, correct, because you would want that investigated right away, correct?

*A*. Not necessarily.

*Q*. And you might want that investigated before all the witnesses got together and had an opportunity to speak to each other, correct?

As a law enforcement officer, you're saying it's not important to talk to witnesses before they all speak to each other?

*A*. How was I to know that they were going to do that?

\* \* \*

-4-

*Q.* Did you ever think of contacting the police and telling them you[r] side of the story?

*[Defense Counsel].* Same objection, your Honor. Continuing objection as to anything along these lines about what my client said or did as it relates to law enforcement.

*The Court.* Over-ruled.

*Q.* Did you ever call law enforcement and tell them your side of the story?

*A.* I didn't call, but I spoke with the detective.

*Q.* When did you speak with the detective?

*A.* I don't remember the date.

*Q.* And you gave him a statement?

*[Defense Counsel].* Continuing objection.

*Q.* Did you ever give Detective Boivon a statement or did you tell him you wouldn't speak with him?

*A.* Well, the first attorney that I had advised me that I didn't need to speak to anyone, and then I got another attorney - -

*Q.* Prior to getting an attorney?

*A.* No, I had an attorney.

*Q.* So you have never given your - - as a Detroit Police Officer for, I forgot how many years, you never said I should go tell law enforcement my side of the story?

This case has been pending for over a year-and-a-half, is that correct?

*A.* Yes.

*Q.* And you have never given them any information that you're reporting today?

*A.* Well the fact that I been - -

*[Defense Counsel].* Continuing objection, your Honor.

*Q.* You can answer the question.

*A.* Oh. Well, the fact that I am in law enforcement, I know how this thing goes. Why . . . would I do that? You would let the chain of events take its course. If he hasn't called me, I'm not gonna call him.

*Q.* And you're saying he never called you?

*A.* When he did, we spoke, yes, and then that's when my attorney first said, well, you don't need to say anything because you haven't done anything. They have to prove the burden of proof. So I was guided by my attorney.

\* \* \*

*Q.* Okay. And again, you didn't think that that might be information that law enforcement would wanna hear prior to a jury trial on a criminal charge?

*A.* Following the guidance of my attorney.

\* \* \*

*Q.* Again, remind me how long you've been a police officer. I didn't write it down. I'm sorry.

*A.* 22 years.

*Q.* And in 22 years, again, it's your testimony of being a police officer, you did not feel it was important to, one, report it, is that correct?

*A.* It wasn't a matter of feeling necessary to report it. I mean , . . . the accusations were being directed towards me. So, naturally, I'm gonna let the courses [sic] of events take its [sic] place.

*Q.* And then second, which kind of leads from what you just said, the accusations are against you, of course you would want your side out there, correct?

*A.* Of course, yeah.

*Q.* Yet you never spoke with Detective Boivon in the past year-and-a-half?

*A.* He never contacted me. We spoke earlier in the . . . beginnings of this, and that was that.

\* \* \*

*Q.* And you first had an attorney on April 24th, correct?

*A.* Well, prior to Mr. Strong.

*Q.* Prior to this attorney?

*A*. Yes.

*Q*. Was April 24th, so there's 15 days there that you had that you could have made your voice heard, correct?

*A*. I guess - -

*Q*. Two weeks?

*A*. Okay. Yes.

"On redirect examination, defense counsel clarified that both he and his predecessor advised defendant 'not to talk to the police.' Defendant affirmed those statements and indicated that he 'followed [that] advice.' " *Id*. at 6.

In closing argument, the prosecutor again focused on defendant's failure to talk to the police:

And then what happens? . . . [PW] has to tell [Shantay]. She has to tell the defendant's wife what happens to her. [Shantay] doesn't call the police, even though he's a law enforcement officer for over 20 years, to get a let's start this investigation, let's talk to everyone, let's hammer everything down. No, she goes to the Humes' house.

There's some old saying about circling the wagon[s] or rally the troops. They wanted . . . to get their stories straight. They wanted to talk before this happened.

A day later, they take her to the hospital. The hospital has to report as . . . Mr. Shelton said, that a sexual assault has happened, but they had to do something. But they made sure they knew what was going on for 24 hours before that happened.

A law enforcement officer for over 20 years never speaks with law enforcement, never. During the entire pendency of the case, for the two weeks that he doesn't have a lawyer. [*Id*. at 6-7.]

Defense counsel interrupted the prosecutor's closing argument to object to the reference to defendant's failure to talk to the police. *Id*. at 7. The trial court then stated to the jury:

Let me just say to the jury, obviously, the constitution provides everybody the right to refuse to make a statement, and you can't hold it against the defendant if he didn't make a statement.

I think the prosecutor's point was to try to point out the fact, I don't think the [sic] he wasn't being asked whether he refused to make a statement. I think she was commenting upon the fact that he did what he did. So we'll go on from there. [*Id*.]

In *Shelton I*, unpub op at 7, this Court affirmed defendant's convictions. In doing so, we noted, "[u]nfortunately, the legal basis or bases for defense counsel's objections were never placed on the record." In a concurring opinion, Judge GLEICHER indicated that had a challenge been placed on the record, she would have held "that Shelton's silence was not probative of anything, including his credibility, and should have been off-limits during the trial." *Shelton I*, (GLEICHER, J., concurring), unpub op at 2. Defendant's "silence" also "carried a substantial potential for prejudice," Judge GLEICHER opined, "as the jurors likely did not understand the difference between impeachment and substantive evidence." *Id.*

## II. ANALYSIS

Courts have long held that a criminal defendant's postarrest silence is not a proper topic for trial. Such silence is "insolubly ambiguous." *Doyle v Ohio*, 426 US 610, 617; 96 S Ct 2240; 49 L Ed 2d 91 (1976). There are many sound reasons for a defendant to remain silent; silence does not necessarily equate with guilt. "[T]he accused might well remain silent because he is angry, or frightened, or because he thinks he has the right to remain silent" as oft repeated in television and movies. *Ex Parte Marek*, 556 So2d 375, 381 (Ala, 1989). Indeed, one would be hard pressed to find any American who cannot paraphrase, "You have the right to remain silent," and "anything said can and will be used against [you] in court." *Miranda v Arizona*, 384 US 436, 469; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

There is also a long history of limiting the use of a defendant's *prearrest* silence. In *Commonwealth v Nickerson*, 386 Mass 54, 61 n 6; 434 NE2d 992 (1982), the Massachusetts Supreme Court accurately observed, "[A]n individual's failure to speak may be the result of his awareness that he has no obligation to speak, his caution arising from knowledge that anything he says may be used against him and his belief that efforts to exonerate himself would be futile." This principle holds true even before an individual's arrest. Accordingly, the Court established an evidentiary principle applicable to cross-examination focused on a defendant's prearrest silence: "In general, impeachment of a defendant with the fact of his pre-arrest silence should be approached with caution, and, wherever it is undertaken, it should be prefaced by a proper demonstration that it was 'natural' to expect the defendant to speak in the circumstances." *Id.* at 61. It would not be "natural," the Court explained, for a defendant to come forward and produce incriminating evidence against himself. *Id.* Nor does a defendant have a duty to report a crime, or "to offer exculpatory information to the authorities." *Id.* at 60. Therefore, allowing cross-examination focusing on prearrest silence "says little about the truth of . . . trial testimony." *Id.* If a Massachusetts trial judge allows impeachment with prearrest silence, "the judge should, on request, instruct the jury to consider that silence for the purposes of impeachment only if they find that the witness naturally should have spoken up in the circumstances." *Id.* at 62.

The Michigan Supreme Court approved this approach in *People v Collier*, 426 Mich 23; 393 NW2d 346 (1986). At issue in *Collier*, 426 Mich at 26, was "whether the Court of Appeals properly reversed defendant's conviction on the basis of improper prosecutorial cross-examination and argument concerning defendant's prearrest failure to inform the police of his version of the facts that he had been robbed," and stabbed the victim in self-defense. After discussing *Nickerson* at length and adopting its evidentiary approach, the *Collier* Court noted, "Allowing impeachment with prearrest silence suggests that a defendant has a duty to incriminate himself and burdens his

-8-

right to testify on his own behalf." *Id*. at 34. Accordingly, impeachment with prearrest silence should be undertaken with extreme caution. *Id*.

The Michigan Supreme Court later reaffirmed *Collier*'s cautious stance. In *People v Cetlinski (After Remand)*, 435 Mich 742, 746-747; 460 NW2d 534 (1990), the Michigan Supreme Court held:

> We hold that the use for impeachment purposes of a defendant's prior statement, including omissions, given during contact with the police, prior to arrest or accusation, does not violate the defendant's constitutional rights as guaranteed under the Fifth and Fourteenth Amendments or the Michigan Constitution. Indeed, long before *Jenkins v Anderson*, [447 US 231; 100 S Ct 2124; 65 L Ed 2d 86 (1980)], the United States Supreme Court had held the Fifth Amendment was not violated by impeachment of a testifying defendant with voluntarily given prior inconsistent statements. *Harris v New York*, 401 US 222; 91 S Ct 643; 28 L Ed 2d 1 (1971). The use of a defendant's prearrest, pre-*Miranda* "statements" for impeachment purposes is one of relevancy, an evidentiary matter. The threshold inquiry is whether this evidence makes "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. See [*People v Collier*, 426 Mich 23, 36; 393 NW2d 346 (1986)]. [Footnote omitted.]

The Court continued:

> *People v Collier* adopted the evidentiary rule that nonverbal conduct by a defendant, a failure to come forward, is relevant and probative for impeachment purposes when the court determines that it would have been "natural" for the person to have come forward with the exculpatory information under the circumstances. Because a defendant has no duty to come forward, the Court observed that his failure to do so was so ambiguous that it did not in and of itself allow a trial judge to conclude that it amounted to an assertion of the nonexistence of the fact testified to. Thus, where the prosecutor's theory of impeachment is that the defendant is not telling the truth because he did not come forward and offer what he now testifies to, we held that a trial court properly permits impeachment if it would have been natural and expected for the defendant to come forward with the story he relates during trial. In doing so, we necessarily concluded that the mere failure to come forward did not permit a rational juror to draw an inference as to credibility. We also necessarily recognized that nonverbal conduct, the failure to come forward, could be conduct inconsistent with trial testimony. [*Cetlinski*, 435 Mich at 760-761 (footnotes omitted).]

Following *Cetlinski*, the Michigan Supreme Court reaffirmed in *People v Hackett*, 460 Mich 202, 214; 596 NW2d 107 (1999), that "[t]he issue of prearrest silence is one of relevance."

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. For prearrest silence to be "relevant," it must "have been

-9-

'natural' for the person to have come forward with the exculpatory information under the circumstances." Guided by these principles, we conclude that evidence of defendant's prearrest silence was not relevant, even for impeachment purposes.

It would not have been "natural" under the facts of this case for defendant to speak to the police to plead his innocence. As described by Judge GLEICHER in her concurrence in *Shelton I*:

> It makes perfect sense that a police department veteran would be aware of his Fifth Amendment right to remain silent, and would understand that trying to convince an investigating officer of his innocence was a fool's errand. Given PW's age, the specificity of her allegations, and that the investigation continued after her forensic interview, it was unlikely that Shelton's protestations of innocence would have derailed his prosecution. Lawyers representing clients in Shelton's situation almost always advise silence, and for good reasons. The risks that a client's words might be misunderstood or misquoted far outweigh the minimal chance that an interviewing officer would declare an accused actually innocent and close the file. [*Shelton I*, (GLEICHER, J., concurring), unpub op at 1.]

Defendant's prearrest silence "did not make it more likely that he was lying at trial." *Id*. at 2. Moreover, "[h]e was under no obligation to contact the investigating authorities, and would have gained nothing by doing so." *Id*. His failure to volunteer information to the police simply did not logically bear on whether the jury should have believed his denial of the crime.

Absent any relevance for impeachment purposes, evidence of defendant's prearrest failure to speak to the authorities was inadmissible pursuant to MRE 402. And the improper admission of the evidence was highly prejudicial and outcome determinative, warranting relief. An error is outcome determinative if it undermined the reliability of the verdict. *People v Musser*, 494 Mich 337, 363; 835 NW2d 319 (2013); *People v Krueger*, 466 Mich 50, 54; 643 NW2d 223 (2002). In assessing the impact of a trial error, we must focus on the nature of the error in light of the weight and strength of the untainted evidence. *Krueger*, 466 Mich at 54.

Here, the prosecutor repeatedly questioned defendant about his prearrest silence, taking up several pages of the trial transcript. This case was a consummate credibility contest. There was no physical evidence, no confession, and no third-party eyewitness. PW's credibility was sharply challenged at trial. PW's adult sister testified that PW was a "manipulator" who was not truthful and who should not be believed under oath. Because the verdict hinged on the jury's comparative assessment of the credibilities of defendant and PW, the erroneous admission of evidence impeaching defendant's credibility undermined the reliability of the verdict. See *Musser*, 494 Mich at 363-364 (holding that an evidentiary error was not harmless when assessment of credibility was the pervasive issue for the jury, the evidence was not overwhelming, there was no physical evidence, and there were no third-party witnesses); *People v Gee*, 406 Mich 279, 283; 278 NW2d 304 (1979) (holding that an evidentiary error was not harmless when "the testimony concerning the event was one-to-one, complainant versus defendant. Any corroborating evidence on either side could tip the scales.").

Moreover, the trial court failed to provide a proper limiting instruction regarding the use of the evidence for impeachment purposes only, thereby increasing the risk that the jury would use

the evidence of defendant's prearrest silence as substantive evidence. It is true that, in response to a defense objection to the prosecutor's closing argument, the trial court told the jury that defendant's refusal to make a statement could not be used against him. But that instruction was in regard to the prosecutor's closing argument rather than the admission of evidence, and the trial court provided the jury with no real explanation of the difference between substantive and impeachment evidence. In any event, an instruction provided long after the damage was done likely could not have alleviated its prejudicial effect. See *Musser*, 494 Mich at 364-365 (even with a proper limiting instruction, it is often difficult for a jury to distinguish between substantive evidence and evidence offered for another purpose, and a belated curative instruction did not alter the conclusion that the error undermined the reliability of the verdict).

On this record, the trial court improperly permitted the prosecutor to question defendant at length regarding his prearrest silence and failed to instruct the jury to limit its consideration of this information. Therefore, defendant is entitled to relief.

We vacate defendant's convictions and sentences and remand for a new trial at the prosecutor's discretion.


/s/ Elizabeth L. Gleicher
/s/ Deborah A. Servitto
/s/ Anica Letica